Jones, Chief Judge,
delivered the opinion of the court:
On May'28,1947, the plaintiff entered into a contract with the Quartermaster Corps of the United States Army to furnish a specified amount of powdered laundry soap. It alleges that the defendant breached the contract in failing to supply shipping instructions, thus preventing it from accelerating delivery.
The defendant filed a special plea in fraud. At the trial the evidence was limited to the issues raised by the special plea and that is the sole issue before the court at this time.
The invitation to bid was issued on May 12, 1947. The bidding was on the furnishing of 2,190,000 pounds of laundry soap. The invitation stated that sealed bids in triplicate would be received until 12 noon of May 19, 1947. It also stipulated that' delivery of the soap should be in monthly installments of 440,000 pounds each on the last day of August, September, October, and November 1947 and the remaining 430,000 pounds by December 31, 1947. The invitation itself contained this provision:
•Contractor is requested to accelerate and increase the deliveries to any extent provided the total of such accelerated and increased deliveries does not exceed the total quantity stipulated herein.
The invitation also notified prospective bidders that the vendor would be required to comply with instructions with respect to quantities, consignees, destinations and delivery dates as set forth in Vendor’s Shipping Documents (VSD’s) to be supplied by the Government at a later date. It was apparent to bidders that at least 1,750,000 pounds of tallow would be necessary for the manufacture of the soap included in the invitation, tallow being the principal ingredient in the manufacture of such soap. Actually 1,850,000 pounds were used.
The ceiling price on tallow had been removed by act of Congress-some months before the contract in question was executed. Almost immediately the price of tallow rose to 21% cents per pound, gradually increased until March 1947 when it was 26% cents per pound, then gradually decreased until in May' it was 12% cents per pound. Several days prior to May 19, 1947, plaintiff decided to submit a bid of *623 $0,139 per pound for the soap, but this figure was changed on the morning of May 19, 1947, just before the bid was submitted, at the instruction of Mr. Kamen who directed that a price of $0,119 per pound be inserted in the bid. He took this action after learning from a tallow broker that the price of tallow had dropped to 12% cents per pound, and that the trend in the tallow market was downward.
The bid form stated that the period for'acceptance of the bid would be 60 days if no shorter period was specified by the bidder. The bid form contained a blank space to be filled in by the bidder to show the number of days required by him for acceptance of the bid. This space was left blank in plaintiff’s bid, which allowed the full period of 60 days for its acceptance. There was another blank in the bid form under the heading of “Delivery or shipment desired.” In this blank plaintiff’s bid read “as scheduled or better.” Mr. Kamen, plaintiff’s president and treasurer, personally delivered plaintiff’s sealed bid in triplicate to the New York Quartermaster Purchasing Office (NYPO) on the morning of May 19, 1947, and remained there throughout the bid opening.
Plaintiff contends that it also submitteed with its bid a covering letter of May 19, 1947, limiting the time for the Government’s acceptance to ten days from the date the bids were opened- The question of whether or not such a letter was submitted bears upon defendant’s special plea in fraud. A copy of the letter which plaintiff claims was submitted is set out in finding 14.
On May 19, 1947, all the sealed bids, including those re- ' ceived by mail and those personally delivered by the bidder, were opened. The bid officer then read aloud for the information of all present the pertinent data on the bid, including the time allowed for the acceptance of the bid and other •delivery conditions. Where a bid was accompanied by a letter the contents of the letter also were read by the bid officer. The bid of the John T. Stanley Company was accompanied by a letter, and this letter was read;
Accox-ding to the recollection of all the witnesses present at the bid opening, including Mr. Kamen, no covering or qualifying letter from plaintiff was read in connection with *624 plaintiff’s bid. Mr. Kamen, who remained throughout the proceedings, did not mention that a letter had been submitted with plaintiff’s bid, nor did he make any statement or protest in connection with the contract provision as to the time within which plaintiff’s bid might be accepted by the defendant. Plaintiff’s bid was the lowest of the seven received. Mr. Macintosh, the defendant’s commodity section representative, took with him the second and third copies of each bid. These were used in preparing and checking certain documents which were required before an award could be made. Among these documents was an abstract of all bids which was made by taking from the bids and entering on the abstract sheet pertinent information including the name and address of each bidder, the quantity bid upon, the delivery schedule, if different from that specified in the specifications, and the time allowed by each bidder for the acceptance of his bid.
After the abstract was prepared the information thereon was verified by the bid officer, who compared it with the original bid in his possession. The particular information set forth in the covering letter submitted with the bid of the John T. Stanley Company was abstracted along with other information. No reference to a covering letter claimed to have been submitted by plaintiff with its bid was made in either the abstract of the bid or the approval of the award.
It was necessary to obtain the approval of the Quartermaster General in Washington before the award could be approved. This was done and on May 28, nine days after the opening of the bids, Mr. Macintosh notified Mr. Kamen by telephone that the plaintiff’s bid for the entire quantity of soap was being accepted, and that a letter of award would follow.
The next day plaintiff received the letter of award dated May 28,1947. This letter stated that the shipment would be made in accordance with the schedule specified in the invitation and that the destination of such shipments would be shown on Vendor’s Shipping Documents to follow.
The price of tallow on May 31, 1947, was 12% cents per pound. On June 13, 1947, it declined to 11% cents per pound, where it remained through the rest of June, July, *625 and until August 29, 1947, when it increased to 12% cents per pound. It gradually increased until on September 30, 1947, it had reached 19% cents per pound.
On May 16, 1947, plaintiff submitted to the Veterans’ Administration a bid to furnish additional soap and was awarded the contract which required more than 400,000 pounds of tallow. Plaintiff thus had commitments on the two contracts which would have required a total of approximately 2,400,000 pounds of tallow. Its storage capacity in Barberton, Ohio, where the plant was located, was 500,000 pounds of tallow. Its inventory was only a little more than 300,000 pounds. Plaintiff ordered some additional shipments in May, June, and September, as set out in findings 26 and 29. It did not order any tallow during July and August 1947. Two cars which plaintiff had purchased at 18% cents per pound were resold by it in November at 22 cents per pound. One car purchased at 19% cents per pound was resold in November at 25% cents, and two cars purchased at 19% cents were resold by plaintiff in November at 22% and 23% cents per pound.
On July 12, 1948, plaintiff submitted a claim to the General Accounting Office in which it asserted that during the period from June 2 to September 26, 1947, it had consumed 1,555,285 pounds of tallow in producing soap for the Veterans’ Administration, for commercial customers and for State and Federal agencies other than the Quartermaster Corps.
In the pending action, which was filed March 13, 1950, plaintiff asserts that the Government failed in June and July 1947, to furnish shipping documents, to provide information needed for marking shipping containers and to supply inspection service, and that as a result plaintiff was compelled to defer delivery of the tallow ordered in May and June. Plaintiff also contends that the Government’s breach of the contract forced plaintiff to seek new business and to sell soap produced from the tallow ordered for the contract at a loss.
However, in its claim of July 12, 1948, which is referred to in a previous paragraph, plaintiff did not assert that the defendant’s breach of contract had compelled plaintiff to *626 postpone delivery of the tallow purchased for the contract.
The contract involved in this suit provided that when the soap was ready for shipment plaintiff should notify the headquarters of the Quartermaster Inspection Service in New York City. On July 8,1947, the defendant’s area supervisor addressed a letter to plaintiff at Barberton stating that he planned to visit the plant on July 11, 1947, to discuss arrangements for inspecting, packing, marking and shipping the soap to be supplied under the contract. He assigned the inspection work to Peter Carr, an inspector under his jurisdiction. Mr. Carr promptly advised plaintiff of his assignment and gave the address at which he could be located, but on July 23, 1947, not having heard from plaintiff, he telephoned plaintiff’s plant engineer to inquire when production of the soap for the contract would begin. He was told it would not be ready for a few days, whereupon Mr. Carr advised that he was starting on an inspection trip and left information listing the places at which he could be reached during the month. When he arrived at the Barberton plant on August 1,1947, plaintiff’s manager stated that he would soon be ready to produce soap. On August 4,1947, plaintiff started production of soap for the contract and promptly notified Mr. Goodman, the area supervisor, that inspection services were needed. Mr. Goodman went to plaintiff’s plant in response to this message and on August 7,1947, he notified Mr. Carr that his services were required at the Barberton plant. Mr. Carr arrived there on August 8, 1947, at which time a batch of soap of approximately 60,000 pounds had been manufactured and was ready for inspection.
It was necessary to have Vendor’s Shipping Documents before plaintiff could make shipment. On several occasions during June and July representatives of plaintiff orally requested Mr. Macintosh to supply shipping documents, but were unable to obtain them. Mr. Macintosh informed plaintiff that on account of the lack of storage facilities shipping documents could not be issued in advance of the dates provided in the shipping schedule. The first shipping documents were issued by the NYPO on August 8, and received at the plant on August 11,1947; the first shipment was made the same day. Between August 5 and 9,1947, there was some *627 delay due to the lack of sufficient tallow at the plant. After August 28, 1947, there was no delay for lack of shipping documents. During the period August 8 to November 19, 1947, the Government issued and delivered to plaintiff YSD’s covering the entire quantity of soap to be shipped under the contract. Plaintiff shipped a total of about 400,000 pounds of soap in August, September, and October 1947. No shipments were made in November and December 1947.
The sharp increase in the price of tallow during the period August 29 to September 30, 1947, was due largely to the fact that on September 11, 1947, the Government, through the Department of Agriculture, announced export allocations of fats and oils for the fourth quarter of the year, which exceeded by 276,000,000 pounds the allocation for the same quarter of the previous year. Word of the proposed increase in exports may have reached the trade in advance of the official announcement, since a sharp upward movement started about two weeks before the announcement was made.
On September 30,1947, Mr. Kamen wrote the contracting officer a letter which is set out in finding 41, in which he requested “your immediate consideration to delay delivery or increase the price of soap under this contract as it is working a tremendous hardship on our company.” Plaintiff called attention to the fact that the Government had increased the allocation of fats and oils for export and that the price of fats and oils used in the manufacture of soap had increased to practically double the price available at the time the contract was executed. The Government was asked to modify the contract in order to relieve the hardship. The letter en route to the contracting officer passed through the hands of Mr. Macintosh who initialed it and added the words “merits consideration.”
Mr. Kamen conferred with the contracting officer early in October and again urged an increase in the contract price upon the ground that the Government’s export program for fats and oils was responsible for the sharp rise in tallow prices. On October 13, 1947, the contracting officer suggested that the plaintiff submit a specific presentation of its claim, showing the actual loss to be incurred by plaintiff, accompanied by a brief statement as to why plaintiff had *628 not covered itself with the necessary basic materials after the contract had been awarded. Plaintiff replied under date of October 31,1947, again contending that the Government’s increased export allocation of fats and oils had caused the domestic increase in the price of tallow, and gave as the reason for not having covered itself with basic raw materials that it had been the practice and policy in the industry to purchase tallow for 30 to 60 days ahead. The letter emphasized the fact that the contract made in May stated that the delivery was not to start until August, and stated that plaintiff was not able to procure its August requirements of fats and oils until July. Mr. Kamen also stated in a later letter that at the time the bid was accepted, it was impossible for either side to foresee the conditions that had developed. These letters are set out in findings 43 and 44.
On November 21, 1947, the contracting officer advised plaintiff that its contentions did not constitute excusable causes of delays within the meaning of the contract; that his office had no authority to grant an increase in the contract price on the basis set out in plaintiff’s letter, and that plaintiff was obligated to make deliveries in accordance with the delivery schedule at the price set forth in the contract.
During all these communications no contention had been made by plaintiff that it had undertaken to accelerate delivery under the contract but was prevented from doing so by the Government’s failure to supply the necessary shipping documents. Nor did plaintiff in any of these letters claim that its bid had been qualified by a covering letter indicating that it intended to accelerate its deliveries under the contract.
Another letter was written on December 8,1947, requesting that plaintiff be allowed to delay the delivery of soap under the contract until the price of fats and oils receded. It repeated the assertions from the previous letters. In addition plaintiff for the first time contended that it had intended to accelerate deliveries under the contract and would have completed such deliveries prior to September 12, 1947, had it not been for the failure of the Government to supply the necessary shipping documents and inspection service. Pertinent parts of this letter are set out in finding 46. This *629 letter was intended as an appeal from the decision of November 21, 1947. Several more letters passed between plaintiff and Col. Herbert B. Watson, who was appointed as the successor contracting officer.
On April 29, 1948, while plaintiff’s appeal was pending before the War Department Board of Contract Appeals, the contracting officer wrote plaintiff stating that its right to deliver the remainder of the soap called for under the contract had been terminated under Article 5 entitled “Delays — Damages”; that the Government would purchase the undelivered quantity in accordance with the terms of the contract, and that any excess cost would be charged against plaintiff. At that time plaintiff had delivered a total of 490,589 pounds of soap, leaving 1,699,402 pounds undelivered.
On May 7,1948, a conference was held in the office of the contracting officer, at which time it was agreed by both parties that plaintiff would continue deliveries of the undelivered portion of the contract, commencing on May 24,1948, and would deliver at the rate of not less than 600,000 pounds of soap per month until the full quantity was delivered. It was also stipulated that plaintiff would withdraw its appeal without prejudice to its right to file a claim for damages with the General Accounting Office.
By letter dated July 13, 1948, plaintiff filed with the contracting officer a claim which was addressed to the General Accounting Office. Plaintiff claimed reimbursement of losses amounting to $261,610 which it alleged resulted from: (1) losses sustained in the disposal of tallow procured for use on the contract and sold elsewhere because of the Government’s failure to accept delivery in accordance with the accelerated delivery clause of the contract, and (2) losses occasioned by the Government’s demand for delivery of the soap at a later date, and by its acts which caused an increase in the price of tallow. It asserted that the losses were due to the Government’s failure to furnish Vendor’s Shipping Documents promptly.
The claim was transmitted by the contracting officer to the office of the Chief of Finance, Department of the Army, with the report and recommendation of the contracting officer. *630 The report stated that in the opinion of the contracting officer the Government had breached the contract in refusing to accept accelerated deliveries, and that the contractor was entitled to provable damages therefor. It stated, however, that the memorandum of endorsement by Mr. Macintosh indicated that he had no recollection of having had any conversations with the plaintiff regarding delivery schedules, but that Mr. Macintosh had admitted that after the award was made the representatives of the company made telephonic and personal visits to his office requesting shipping instructions. Mr. Macintosh’s memorandum is set out in finding 51. In it he stated that no written requests were received from the plaintiff for VSD’s, but that he had been telephoned regarding the issuance of VSD’s and had advised that due to the lack of storage facilities, authority to comply with the acceleration clause was denied. The memorandum stated that the contractor was advised that it must comply with the shipping schedule as outlined in the contract.
In late September the office of the Chief of Finance of the Department of the Army wrote plaintiff that its claim had been forwarded to the General Accounting Office for direct settlement. On November 17, 1948, the General Accounting Office forwarded to the Chief of Finance of the Department of the Army a letter which has been characterized by officers of the General Accounting Office as a development letter. The General Accounting Office did not make an independent investigation of the matter, but issued the letter on the basis of the information set forth in plaintiff’s claim and the data transmitted by the Army. The letter is set out in finding 52. It stated that on the basis of the information submitted the contractor was entitled to whatever increased cost it was required to incur in the manufacture and delivery of the soap called for in the contract, not exceeding the reasonable value of the soap determined upon the basis of the prices prevailing for similar soap at the time deliveries were made. Later the General Accounting Office advised plaintiff that the contracting officer had been requested by it to furnish a determination as to the amount which might be allowed on plaintiff’s claim pending completion of a final audit.
*631 From November 1946 until the end of December 1949 the NYPO was under the command of Gen. L. M. Grice. The New York office was a multiple procurement office which had from 10 to 30 contracting officers under the command of General Grice. Matters involving a major question of policy were usually presented to General Grice, but it was not until December 1948 after the General Accounting Office had issued the development letter that General Grice learned of plaintiff’s claim and the fact that it had been submitted to the General Accounting Office with the recommendation of Colonel Watson, the contracting officer. General Grice sent for the files, talked wi.th some of the personnel in the office and quickly concluded that Colonel Watson of his office had made a serious mistake in recommending the approval of plaintiff’s claim.
General Grice then convened a series of meetings in his office. One of these meetings on December 10, 1948, was attended by General Grice and other personnel in his office as well as by Mr. Kamen and his attorneys. A number of questions were asked Mr. Kamen regarding his conversation with Mr. Macintosh prior to the submission of plaintiff’s bid; also concerning plaintiff’s inventory of tallow; its acquisition and sale of tallow; plaintiff’s other contracts and the amount of tallow required for them; plaintiff’s efforts to obtain Vendor’s Shipping Documents, and other pertinent subjects.
General Grice ordered Colonel Watson, who was en route to a permanent station in Japan, to return. He also recalled Colonel Kuhn who had served as contracting officer on plaintiff’s contract from May to December 1947, and asked him to make a written statement regarding his knowledge of plaintiff’s claim. An attorney in the legal section of the New York office who had no prior connection with the claim was detailed by General Grice to assist in the investigation, and auditors were assigned to make an investigation and report on the accounting data submitted by the plaintiff. Statements were taken from the inspector, information was obtained regarding the availability of storage space at the time plaintiff’s contract was entered into, and an investigation *632 was made as to the availability of export packing containers.
On December 24,1948, Colonel Watson, the successor contracting officer, submitted his supplemental report and recommendation on plaintiff’s claim. This report was a complete reversal and repudiation of his original report of September 2, 1948. The report stated that no request for Vendor’s Shipping Documents had been made of Colonel Kuhn, the contracting officer during the period involved; that Colonel Kuhn had not delegated his authority to any person, and that neither Mr. Macintosh nor any other employee had the authority to reject any request or make any administrative decision even if such request had been made. The report further stated that the contractor had not complained, prior to submitting its claim on December 8,194T, that the Government had failed to supply shipping documents.
The report of the contracting officer, together with the statement and recommendation of General Grice with the endorsement of the Quartermaster General, was forwarded to the General Accounting Office on January 13, 1949. The Army also submitted other data which had been procured in the course of the investigation. The Army sent several auditors to plaintiff’s office in New York and the investigation extended over a period of more than six months. Mr. Kamen made plaintiff’s files fully available to them and when the audit was completed, there was submitted a determination made by the contracting officer who succeeded Colonel Watson to the effect that the plaintiff was not entitled to recover anything on its claim.
On July 12, 1949, the General Accounting Office issued a settlement certificate denying plaintiff’s claim. The reasons for the denial are set out in finding 58. Among other reasons was a finding that plaintiff’s letters of September 30, October 31 and November 7, 1947, demonstrated that plaintiff did not have sufficient tallow on hand to manufacture the soap covered by the contract and understood that it was not bound to complete deliveries prior to the dates .set out in the contract; that the tallow which plaintiff had on hand was used for filling other orders, including a contract with the Veterans’ Administration; that the plaintiff *633 sold substantial quantities of tallow at a profit during the months of August, September, and October 1947, although plaintiff had contended that it could not obtain sufficient tallow to complete performance of the contract. Several other reasons were given. Plaintiff requested reconsideration. An attorney in the General Accounting Office, Stephen P. Haycock, was charged with the duty of reviewing the evidence and preparing a decision.
As a part of the effort to secure a reversal of the General Accounting Office’s decision of July 12, 1949, Mr. Kamen filed an affidavit which covered many phases of the controversy, including a detailed statement to the effect that he intended, and that he so advised Mr. Macintosh at and after the date plaintiff received the invitation to bid, to begin the manufacture and shipment of the soap immediately after the contract was awarded and to complete all deliveries by the end of August 1947. Mr. Macintosh submitted an affidavit dated September 28,1949, denying many of the assertions in Mr. Kamen’s affidavit and stating that while plaintiff had requested VSD’s prior to August 1947, such requests appeared to be routine and were made without any indication that the contractor intended to accelerate deliveries of soap.
During a conference with one of plaintiff’s attorneys on September 15, 1949, Mr. Haycock advised the attorney that the evidence available in the General Accounting Office did not indicate that plaintiff intended to accelerate delivery of soap under the contract and stated that the evidence prior to plaintiff’s letter of December 8, 1947, did not show any intention to accelerate. Mr. Haycock also advised plaintiff’s attorney that if plaintiff had any documents which indicated its intention to accelerate delivery such documents should be produced without delay.
On the following Tuesday, September 22,1949, Mr. Kamen telephoned Mr. Haycock stating that his attorney had acquainted him with Mr. Haycock’s comments at the conference. In the same conversation Mr. Kamen related that as a result of the call from plaintiff’s attorney he had searched the files and found certain interoffice memoranda and teletype messages which passed between plaintiff’s New *634 York office and its Barberton plant. He read one of the memoranda and inquired whether that was the type of evidence Haycock had in mind and was told that it was.
On September 22, 1949, Mr. Kamen wrote his attorneys and enclosed photostatic copies of several teletype messages to and from plaintiff’s Barberton plant and also four photostatic copies of interoffice memoranda between the New York office and the Barberton plant. This letter is set out in finding 59. These documents were sent by plaintiff’s attorneys to the General Accounting Office for the purpose of overcoming the objections raised to plaintiff’s claim. By letter of October 1, 1949, plaintiff’s attorneys transmitted to Mr. Haycock three additional interoffice memoranda between plaintiff’s New York office and its Barberton plant. These were dated June 12, July 11, and July 16, 1947. The three memoranda submitted on October 1,1949, were on tissue and each was marked “copy.”
Defendant’s plea of fraud is directed to the seven interoffice memoranda above referred to, and these are set out in full in findings 81 to 87, inclusive.
On November 3,1949, the Comptroller General issued his decision on the plaintiff’s request for reconsideration. The decision, which is in evidence, summarized plaintiff’s claim in connection with the evidence which was made available to the General Accounting Office and stated that such evidence did not support either plaintiff’s contention that it intended to make deliveries of soap at the rate of 800,000 pounds a month beginning the first of June 1947 and to complete the contract before the middle of August 1947, or its assertion that it had the ability to accelerate as represented, but on the other hand indicated that plaintiff was delinquent in deliveries after YSD’s were furnished.
A few days later Mr. Kamen conferred with Mr. Haycock of the General Accounting Office and challenged a statement in the Comptroller General’s decision to the effect that plaintiff was delinquent in deliveries of soap even after shipping documents had been furnished, and asserted that he could establish the inaccuracy of the statement.
The same afternoon Mr. Kamen telephoned from the New York office to Mrs. Vesta McCanna, an employee in the *635 Barberton office, and instructed her to make a thorough search for the bills of lading. Prior to that date he had requested the office at Barberton to send all papers pertaining to the Quartermaster contract to the New York office. Mrs. McCanna advised him that all such papers had been sent to New York in response to the previous request, but he insisted that she make a thorough search anyway. She did so and found a carton of documents, including yellow copies of the bills of lading, in a dead storage room on the third floor of the plant. Attached to these copies was also a copy of plaintiff’s bid and a carbon copy of the letter of May 19, 1947. Mr. Kamen instructed that the entire carton be sent to bim in New York. He then telephoned Mr. Haycock in Washington stating that he had found the bills of lading. He also read the letter to Mr. Haycock, who suggested that these documents be mailed to the General Accounting Office.
On November 26, 1949, plaintiff’s attorneys requested the Comptroller General to reconsider his decision primarily on the basis of the letter of May 19,1947. This letter is set out in finding 64.
Plaintiff’s attorneys submitted two copies of the letter of May 19, 1947; one was a ribbon copy marked “copy” and the other was a photostat.
Plaintiff’s claim that the letter of May 19, 1947, established the fact that it had sought to accelerate the deliveries of soap under the contract was also brought to the attention of officials of the Department of the Army.
Plaintiff’s attorneys on November 28, 1949, wrote to the Assistant Secretary of War asserting that the NYPO had distorted the facts and had lost the letter of May 19, 1947.
The General Accounting Office requested the Quartermaster General to make a thorough search for the original of the letter dated May 19, 1947, and to make a full report as to this and several other contentions. This request was referred to the NYPO, and Harry D. Shargel, an attorney in the legal section of the NYPO, was directed to make the search. He examined all the files in the office pertinent to the contract and interviewed all the NYPO personnel whom he believed to have had occasion or opportunity to see the letter. His search failed to produce any information *636 regarding the letter. Until the General Accounting Office letter of December 1, 1949, was handed to him, Mr. Shargel had never received any information regarding the existence of the letter which plaintiff claims was submitted with its bid. The Department of the Army submitted its report to the General Accounting Office, detailing the search covering several matters, but definitely stating that no trace of the letter had been found. A number of affidavits were attached to the report.
On February 13, 1950, the Comptroller General denied plaintiff’s request for reconsideration and stated that after an exhaustive search no trace could be found of such a letter. On March 13, 1950, plaintiff filed its petition in this suit to recover $1,800,000 damages claimed to be due as the result of breaches of the contract by the defendant.
In connection with the preparation of the Government’s defense, the Federal Bureau of Investigation was requested to make a complete investigation and audit including especially all facts relating to the letter of May 19,1947, and the seven interoffice memoranda, copies of which had been submitted by plaintiff to the General Accounting Office on September 23 and October 1, 1949. The investigation was conducted primarily by Special Agents George Simpson and Thomas Hurley, at times assisted by other agents. Considerable time was spent in plaintiff’s office. Mr. Kamen and his employees cooperated and allowed free access to the files and records.
Among the records made available to them was a file marked “A May 19,1947, Cover Letter.” After photographing the letter, the agents returned the file to Mr. Kamen. It was subsequently established that all four copies of the letter in the file were from the same typing run. The agents later asked plaintiff to supply the carbon copy of the original letter which plaintiff claimed had been written and submitted to the New York Quartermaster office on May 19,1947. Mr. Kamen searched his records and produced the folder which the agents had returned to him three days before. At the time the folder contained only the photostat of the letter. The agents stated that they wanted the carbon typed in 1947 rather than a photostatic copy thereof. When *637 Mr. Kamen was unable to find the carbon in the file, they asked him to sign a statement on the reverse side of the photostat to the effect that the original of the carbon copy, from which the photostat was made, was personally delivered by him to the Army Quartermaster. At the beginning of the statement the words “I believe” were added at Mr. Kamen’s request before he would sign it. The agents then requested Mr. Kamen to produce the seven interoffice memoranda which plaintiff claimed had been prepared in 1947. The investigators insisted they wanted the actual memoranda.
Later, on July 10, 1950, while the agents were in Mr. Kamen’s office, he delivered to them a carbon copy of the letter of May 19, 1947. The agents told him that they desired to deal only with original evidence and pointed out that they had previously seen the ribbon copy, two carbon copies and a photostatic copy of the letter in the folder. The agents asked him if he was certain that the letter tendered by him was the true carbon copy prepared in 1947. He replied that he thought it was the true carbon copy but that he could not be positive. At the agents’ request he promised to notify them later if he found the document which he decided was the true carbon prepared in 1947. On the same date, July 10, 1950, Mr. Kamen also delivered to Agents Simpson and Hurley seven interoffice memoranda with the statement that the documents were being supplied in accordance with the request the agents had previously made on June 26,1950. These documents consisted of a carbon copy and six ribbon copies of letters on interoffice memorandum forms.
The agents learned that the procedure in plaintiff’s office in the transmission of interoffice memoranda was to send the original memorandum written on the printed form to the office receiving the message and to retain a carbon copy of the document in the office which sent the message. While this procedure was followed in general, it was found that on some occasions the carbon copy was sent to the receiving office and the original retained in the office from which the message was sent. Hence, when the seven interoffice memoranda were furnished, the agents requested Mr. Kamen to obtain and deliver to them the other half of each of said seven interoffice memoranda. These were later furnished.
*638 On August 29, 1950, upon receiving a message that Mr. Kamen desired to see him on an important matter, Mr. Simpson called at plaintiff’s office and was told by Mr. Kamen that while he was reviewing a legal file at his home, he had found an additional copy of the May 19, 1947, letter, and that he had concluded that this document was the true carbon copy of the letter, because it was attached to another letter that had been mailed to him by his attorney. Part of the sheet upon which the letter appeared had been torn off at the top and bottom. Mr. Kamen explained that the letter was in a torn condition when he received it from the Barberton' office. He stated that to the best of his knowledge this letter was the duplicate carbon copy of the original which was submitted. He explained that this letter was filed away by the Barberton office staff after the completion of the contract in August 1948 and kept there until their office girl, Miss [sic] McCanna, was requested to send to the New York office copies of YSD’s and bills of lading used in connection with this contract. He also stated that in tearing this letter from the other letters attached to it, it was torn at the upper left hand corner because of the many staples holding it together.
On November 8, 1950, Mr. Kamen delivered to the agents the ribbon copy and one of the carbon copies of the letter of May 19,1947, which they had observed in the folder on June 22, 1950. These had been requested by the agents to make certain that they had obtained all known copies of the letter in Mr. Kamen’s possession. The originals and carbon copies of the memoranda and the five copies of the cover letter were the only copies of such documents that were found by the agents during the investigation.
All these documents were submitted to the laboratory of the FBI in Washington, D. C. The agents also took typing samples made on all the typewriters in plaintiff’s New York office. Before the samples were taken it was ascertained that there had been no sale or exchange of typewriters in the New York office and no interchange of typewriters between the New York and Barberton offices during the period between May 1, 1947, and June 1950. They also made a random selection of letters and memoranda which had been *639 prepared during the period between May 1947 and June 1950, and samples of blank forms of interoffice memoranda found in plaintiff’s supply cabinet.
After reports of the investigation and laboratory analysis had been made, the Department of Justice decided that a plea of fraud should be filed on behalf of defendant in this case, but before it was filed plaintiff’s then attorney of record was informed that the Government had determined that the letter of May 19,1947, and the seven interoffice memoranda had not been prepared on the dates claimed by plaintiff and that the defendant intended to file a plea of fraud.
Thereafter plaintiff’s attorney advised Government counsel that Mr. Kamen had been notified of defendant’s intention to file a plea of fraud and that as a result, Mr. Kamen had delivered to his attorney a carbon copy of the letter of May 19,1947, which Mr. Kamen believed was the true or original copy of that document. Government counsel requested that the letter be submitted to the FBI laboratory, but plaintiff’s attorney stated that he preferred to have the document examined by an expert selected by him. However, on August 2, 1951, plaintiff’s attorney submitted to Government counsel the copy of the letter of May 19, 1947, which had been delivered to him by Mr. Kamen and identified by him, as above stated, as the true or original copy of the May 19, 1947, letter. The carbon copy of the letter was sent to the FBI laboratory where an examination disclosed that it was a carbon copy of the ribbon copy which the FBI agents observed in plaintiff’s files on June 22, 1950; that it was a part of the same typing run as the two carbons they saw in the file on the same date.
The uncontradicted evidence shows that the three carbon copies of the cover letter obtained by Agents Simpson and Hurley were part of the same typing run and were made from the ribbon copy they had observed in the folder on June 22,1950; that the carbon copies were made on Flywate onionskin, which was neither purchased nor used by plaintiff prior to August 1949; that the ribbon copy from which these carbon copies were made was prepared on a typewriter in plaintiff’s New York office in 1949, and that the photostatic copy of the letter delivered to Agents Simpson and Hurley, *640 as well as the photostatic copy submitted to the General Accounting Office on November 26,1949, are both photostats of defendant’s exhibit 1, which Mr. Kamen and his attorney presented to Government counsel on August 2, 1951.
These copies are all on file as exhibits in this case. Defendant’s exhibit 61 is the torn copy of the letter of May 19, 1947. Mrs. McCanna did not identify this exhibit as the copy of the letter which she had found attached to plaintiff’s bid, but in his letter of September 1,1950, Mr. Kamen stated that defendant’s exhibit 61 appeared to be the copy of the letter found by Mrs. McCanna. The letter is torn at the top and bottom to the extent that only a fragment of the watermark remains. As explained in finding 77 a laboratory examination, including an enlarged photograph, shows that the typewriter key which typed the letter “t” in the word “Quartermaster” on the first page of the letter, and the letter “t” on the second page in the word “not” was damaged. A comparison with other interoffice memoranda shows that the damaged “t” first appeared in such memoranda on September 7, 1949. This indicates that defendant’s exhibit 61 was prepared after the middle of the year 1949. However, the expert who made this comparison was able, in connection with his examination of other questioned documents, to point out numerous characteristics in the typing as a basis for his conclusions, and we find that it has not been established by a clear and satisfactory preponderance of the evidence as to when this particular copy of the letter was prepared.
The evidence of record shows clearly and convincingly that plaintiff did not submit the letter of May 19, 1947, to the NYPO with its bid. With the exception of Colonel Watson, who did not testify, the defendant produced as witnesses the officers and employees of the NYPO who, in the normal course of their duties, should have seen the letter if it existed. None of these had ever seen or heard of such a letter prior to March 1949, although more than one thorough search was made. Although Miss Weissman of the plaintiff company made an affidavit on November 17, 1949, reciting that the questioned letter had been dictated to her by Mr. Kamen, signed by him and submitted with the bid, she signed a written statement at the request of Special Agent Simpson *641 on August 20, 1951, to tbe effect that her affidavit was based on the fact that her initials were typed on the lower left hand comer of a copy of a letter that was shown to her at the time and that she could not recall whether she had typed the letter. She testified on the witness stand that she could not recall whether the letter had been dictated by Mr. Kamen and typed by her.
Title 28 United States Code 2514 reads as follows:
A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.
In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture.
It will be noted that this statute goes further than merely banning fraudulent claims. It provides for a forfeiture of the claim if any fraud is practiced or attempted to be practiced in proving, establishing or allowing a claim. This is one of the conditions on which the Government gives its consent to be sued and waives its otherwise sovereign immunity.
The undisputed evidence shows that the originals of the seven interoffice memoranda were prepared on a type of interoffice memorandum form which was first purchased by the plaintiff in May 1949; that the printed interoffice memorandum forms used in plaintiff’s New York office and the Barberton plant in 1947 were of a different printing from the printing on the questioned memoranda; that the carbon copies of the furnished memoranda are on Flywate onionskin, a type of paper which was not purchased or used by plaintiff prior to 1949. Two of the memoranda were purportedly sent from Barberton, Ohio, to the plaintiff’s New York office in 1947, but the undisputed evidence shows that these memoranda were written on forms which were not used in the Barberton office in 1947, but were in fact written on forms which were purchased and used in the New York office in 1949; that the carbon copies of the two memoranda were prepared on a type of paper which was not purchased or used by plaintiff prior to 1949, and that the two memoranda *642 were prepared on a typewriter in plaintiff’s New York office.
When faced with this evidence plaintiff did not deny that the copies furnished by it and in evidence as defendant’s exhibits 47 to 60, inclusive, were prepared in 1949. In his testimony Mr. Kamen denied that he had represented that the questioned documents were the true documents prepared in 1947, but said that if he made such representations he meant only that the contents of the questioned memoranda were the same as those of the true documents.
We are face to face with the question of whether fraud was practiced in the presentation of this claim. Ordinarily fraud can only be established from circumstances.[1] These, however, must be clear and convincing. About the only way a just conclusion can be reached is by placing the questioned documents and statements alongside well-known and established facts. Every event in the universe is linked to every other event. One cause produces an effect, and that effect in turn becomes a cause; thus all events from the beginning of time are woven into one complete pattern.
It is difficult, therefore, to make up a story that is not a part of this one continuous design. It is like a patch on a suit of clothes — it may be made out of the same cloth, may look the same in the middle, but will show around the edges, because it is not a part of the original garment. Likewise a made-up story will not fit into the scheme of events, because it is not a part of it. It will not, therefore, stand close examination. One made-up story calls for another and the last fabrication will not tally with the next fact.
Although plaintiff’s claim had been pending for almost two years, and although numerous conferences were held, letters submitted, and supporting documents filed, there is nothing to indicate that plaintiff had ever referred to any of the questioned documents until after the General Accounting Office had advised plaintiff’s attorney on September 15, 1948, that none of the documents which plaintiff had previously submitted demonstrated plaintiff’s intention to accelerate deliveries under the contract. Within five days after this advice was received, Mr. Kamen telephoned the *643 General Accounting Office that he had located certain interoffice memoranda and teletype messages that had passed between the New York office and the Barberton plant in 1947. In his letter of September 22,1949, he made the unqualified statement that he was transmitting photostatic copies of four of the memoranda of 1947 that he had located in his files. It is not the custom of businessmen of experience to make photostats of copies of documents, especially when the original documents themselves are available. That such was not plaintiff’s practice is, we think, demonstrated by the fact that the second batch of interoffice memoranda transmitted to the General Accounting Office on September 23, 1949, consisted of memoranda typed on tissue and plainly marked “Copy.” The generally recognized purpose of a photostat is to provide an exact reproduction of an important or valuable document in lieu of submitting the document itself.
After it had been established beyond any question that both the originals and the carbon copies of the seven interoffice memoranda, which Mr. Kamen supplied to the Federal Bureau of Investigation agents, were prepared in 1949, plaintiff offered no evidence in explanation of its inability to produce any one of these 14 documents which it says were prepared in 1947.
It is true that original documents are sometimes lost, but if we undertake to accept plaintiff’s claim that copies were made in 1949 of documents that were prepared and sent in 1947, then we must also find that when the need of such proof was made known by the General Accounting Office, Mr. Kamen was able to locate in his files seven original and seven carbon copies of memoranda that were exchanged between the New York office and the plant in 1947; that having-located these documents in September 1949, plaintiff made both ribbon and carbon copies of them on forms similar to but not the same as forms used in 1947; that contrary to the custom normally followed by businessmen, plaintiff then made photostats, not of the original documents, but of the 1949 copies, and sent such photostats to the General Accounting Office; that after the copies were made plaintiff retained seven of them in its New York office and sent seven *644 to Barberton two years after the original documents were purportedly written, and that in 1950 plaintiff had Barber-ton return the copies sent to it in 1949 after the FBI agents had requested the opposite numbers of the memoranda obtained in plaintiff’s New York office.
Under the circumstances which we have described, we find it altogether strange that if plaintiff located and had copies made of the true documents, it was unable to produce a witness who prepared or saw any of the 1947 documents, or who made any of the copies which the evidence shows without dispute to have been prepared in 1949.
In our findings we have pointed out a number of other circumstances from which we must conclude that the questioned documents are inconsistent with and contrary to the established facts. We specifically mention only one more here. The memorandum of May 13, 1947, was purportedly sent by Mr. Kamen from his New York office to the Barberton plant regarding the bid on the contract involved in this suit. However, the unchallenged evidence shows that on the morning of May 13,1947, Mr. Kamen was in the Barberton plant and at that time received a teletype message from the New York office stating that the bid on the Quartermaster contract had been received and that the soap would have to comply with certain specifications. Of course, Mr. Kamen could not write from his New York office to the Barberton plant at the same time he was in Barberton, and the only explanation that plaintiff makes is that the teletype message could have been received by Mr. Kamen in Barberton during the morning of May 13 and that he could have flown to New York and written the questioned memorandum to Barberton on the same date. However, it seems highly improbable to us that after Mr. Kamen had received the teletype regarding the bid opening on this contract, he would forego the opportunity to discuss the matter at firsthand with the manager while in Barberton and would return the same day to write a letter on subject matter which he could have discussed in more detail and with greater convenience while he was in the plant itself. Thus in weaving a story the skein becomes tangled with established facts and the strands do not fit.
It is not a pleasant thing to make a finding of fraud, but *645 the priceless ingredient in the alchemy of American business operations is the integrity of the maker of a product, or of the one who furnishes the materials and services. Only by faith in such integrity can the vast economic system of our country be maintained. We reluctantly find that fraud was practiced in the presentation of this claim. The defendant’s special plea of fraud is sustained, and the claim is forfeited.
Laramoee, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OP PACT
The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation organized and existing under the laws of the State of New York and is engaged in the manufacture and sale of soaps, detergents, cleaning compounds, rust preventives and numerous chemicals. Its principal office and place of business is at 233 Broadway, New York City, and its plant and facilities are located at Barberton, Ohio.
2. Plaintiff brought this action to recover damages for the alleged breach of contract entered into on May 28, 1947, between plaintiff and the Quartermaster Corps, United States Army. Thereafter, the defendant filed a special plea in fraud to plaintiff’s petition and proof at the trial was limited to the issues raised by such special plea.
3. Mr. A. L. Kamen is the president and treasurer of plaintiff and has had the active control and management of the company during the period involved in this suit. Mr. Kamen has been engaged in the business of manufacturing soaps since 1919. During that year, he organized a partnership under the name of Kamen Soap Products Company, which was a small business with gross sales amounting to about $10,000 a year. The plaintiff company was incorporated in 1947 and has grown to the extent that its volume of business amounts to $3,000,000 a year.
4. Mr. Kamen is an officer and part owner of the Globe Crayon Corporation and the Kaglu Corporation, both of which conduct their business at the same plant and in the *646 same office as plaintiff. During World War II, the companies which Mr. Kamen managed manufactured various products for the Armed Forces. In addition to soaps and detergents, these products included antidim sets for use in gas masks, laundry impregnating units for impregnating the uniforms of soldiers, shoe pregnates for pregnating their shoes, and vesicant crayon, which was used to detect the presence of poisonous gases. In order to manufacture these products, Mr. Kamen was given access to classified or secret information.
5. The plaintiff and the other companies managed by Mr. Kamen have dealt with many departments and agencies of the Government and particularly with the Army, the Navy, and the Veterans’ Administration. From 90 to 95 percent of plaintiff’s sales are made to Government agencies.
6. During 1952, the plaintiff and the other corporations in which Mr. Kamen is interested entered into contracts with the Quartermaster Corps, the Navy Department, the Ordnance Department, Veterans’ Administration, and the Chemical Warfare Service. In addition, the Globe Crayon Corporation has two mobilization contracts, involving substantial amounts, with the Armed Services, which are to be effective only in the event of mobilization for war.
7. On May 12, 1947, the New York Quartermaster Purchasing Office, hereinafter referred to as the NYPO, issued invitations to plaintiff and others engaged in the soap trade, inviting bids for 2,190,000 pounds of powdered laundry soap. The invitation stated that sealed bids in triplicate would be received until 12 noon on May 19, 1947. In addition to the bid forms and schedules to be executed by interested bidders, the invitation contained copies of the special conditions covering the invitation and copies of both general and supplementary contract provisions to be incorporated in the formal contract.
Under the heading “Delivery or shipment desired,” the invitation provided for the delivery of the soap in monthly installments of 440,000 pounds each on the last days of August, September, October, and November 1947, and the remaining 430,000 pounds by December 31, 1947. The pro *647 curement directive on which, the invitation was based contained a statement reading: “Accelerate delivery all possible” and the invitation itself provided: “Contractor is requested to accelerate and increase the deliveries to any extent, providing the total of such accelerated and increased deliveries does not exceed the total quantity stipulated herein.”
Fifty percent of the total quantity called for in the invitation was to be packed for domestic shipment, while the remaining 50 percent was to be packed for overseas shipment.
There was set out in the invitation a description of the types of packing containers required for each type of shipment and a statement that the containers should be marked in accordance with Quartermaster Corps Specification No. 94A, which was not attached to the invitation.
The invitation notified prospective bidders that the vendor would be required to comply with instructions with respect to quantities, consignees, destinations, and delivery dates, as set forth in Vendor’s Shipping Documents to be supplied by the Government at a later date.
8. Tallow was the principal ingredient for the manufacture of the soap called for in the invitation. It was apparent to bidders that from 1,750,000 to 1,850,000 pounds of tallow would be necessary for the manufacture of the 2,190,000 pounds of soap included in the invitation. Plaintiff actually used 1,850,000 pounds of tallow in producing the soap under the contract. At the market price prevailing on the date the bids were submitted, the total amount of tallow required would have cost plaintiff $285,875.
9. The tallow market is generally regarded in the soap trade as a fluctuating market. Until October 29, 1946, the price of tallow was controlled by the Office of Price Administration, and the ceiling price was 8% cents per pound. When the OPA ceiling prices were removed by an act of Congress, the price of tallow rose almost immediately to 21% cents per pound, which was the market price during November and December 1946. The prevailing prices at the end of each of the first five months of 1947 were as follows:
*648 January_ 21% cents
February- 22% cents
March_ 26% cents
April_ 16% cents
May_ 12% cents
10. The price of tallow on May 1,1947, was 16% cents per pound. Several days prior to May 19, 1947, plaintiff decided to submit a bid of $0,139 per pound for the soap, but this figure was changed on the morning of May 19,1947, just before the bid ivas submitted, at the instruction of Mr. Kamen, who directed that a price of $0.119 per pound of soap be inserted in the bid. The price of tallow dropped to 12% cents per pound on May 14,1947, and on May 16,1947, Mr. Kamen was apprised of this fact and the further fact that the trend of the tallow market was downward.
11. A total of seven bids, including plaintiff’s bid, was submitted within the time required. The several bids are contained in defendant’s exhibit 9 and disclose the following information with respect to the name of the bidder, the total quantity to be supplied, and the time allowed by the bidder for the acceptance of his bid:
(a) Standard Soap Company of Camden bid on 200,000 pounds of soap at the price of 18 cents per pound and allowed 30 days for the acceptance of its bid.
(b) John T. Stanley Co., Inc., submitted a bid covering 500,000 pounds of soap at a price of 18*4 cents per pound and allowed 60 days for the acceptance of its bid.
(c) Armour & Co. submitted a bid on the total quantity at prices of $0.145 for the domestic pack and $0.1466 for the export pack. Armour & Co. was a prime supplier of tallow and its bid required acceptance within 20 days.
(d) Sterling Supply Corporation submitted a bid covering only the 1,095,000 pounds of soap to be packed for domestic shipment, and the prices quoted ranged from 15% cents per pound for the August 1947 delivery to 17 cents a pound for the December 1947 delivery. Acceptance within 15 days was required.
(e) The bid of the William Messer Corporation covered 220,000 pounds of soap, and the price bid was $0.2875 per pound. This bidder allowed only 20 days for the acceptance of its bid.
*649 (f) Gillam Soap Works submitted a bid covering 750,000 pounds of soap at a price of $0,164 per pound and allowed 60 days for the acceptance of its bid.
(g) Plaintiff Kamen Soap Products Company, Inc., submitted a bid covering the total quantity at the price of $0,119 per pound.
12. The bid form contained a blank space to be filled in by the bidder to show the number of days required by him for acceptance of the bid. It was stated that the period would be 60 days if no shorter period were specified by the bidder. On plaintiff’s bid this space was left blank, thereby allowing the full period of 60 days for the acceptance of its bid.
The bid form also contained a column to be filled in by the bidder unless he agreed to the delivery schedule provided on the form under the heading of “Delivery or shipment desired.” In this blank space covering the proposed delivery, plaintiff’s bid read: “As scheduled or better.”
There was a space on the bid form for the bidder to add the word “Yes” if he desired telegraphic notice of the award and plaintiff inserted the word “Yes” in the space so provided. It was usual and customary for the NYPO to give telegraphic notice of awards, and plaintiff had been notified in that manner on other contracts with the same agency.
13. Plaintiff’s bid was signed by M. E. Weissman, vice president, and witnessed by Herbert Shapiro. Mr. Kamen personally delivered plaintiff’s sealed bid in triplicate to the NYPO on the morning of May 19,1947, and remained there throughout the bid opening.
14. Plaintiff contends that there was submitted with its bid a covering letter of May 19, 1947, limiting the time for the Government’s acceptance to 10 days from the date that the bids were opened. This letter is one of the questioned documents upon which defendant’s special plea in fraud is based. A copy of the letter, in evidence as defendant’s exhibit 1, reads as follows:
As per conversation with Mr. Macintosh at your office several days ago, we refer to the enclosed bid covering 2,190,000 lbs. laundry soap in accordance with Spec. JCQD-27. We note that this soap calls for 80% Anhydrous soap minimum content. It is also our under *650 standing that we can supply this soap in either ground or spray dried form whichever we prefer.
In regard to your request to allow at least 20 days from date of opening of bid for Government to accept this bid we regret that present-day conditions, due to the rapid fluctuation of the tallow market make us unable to extend acceptance time beyond ten days from the opening date.
In case we are the successful bidder, we will appreciate it very much if you can make the award to us within a shorter time. We prefer three days. It will be agreeable to us if you are unable to complete the execution of a formal contract within ten days to write us a letter advising us of this award and follow this with the formal contract as soon as you possibly can.
Our reasons for this request is because of the extremely large amount of soap covered by this bid and the fact that tallow which is the most important item used in the manufacture of soap has been subject to tremendous price fluctuation. We understand that the Acceleration Clause permitting speedy delivery of the contract now in the bid will be a part of the contract. We are submitting our bid on that basis.
We would rather not accept the contract unless you can comply with the above requests. You may rest assured that if awarded the contract, we will do everything possible to expedite delivery at the earliest possible date.
15. On May 16, 1947, the plaintiff submitted to the Veterans’ Administration a bid covering 187,380 pounds of soap chips, 346,200 pounds of laundry bar soap, and 383,700 pounds of powdered laundry soap. In the appropriate blank space provided on the bid form for indicating the period allowed for acceptance of the bid, plaintiff specified that acceptance within 10 days was required.
16. On October 6, 1947, plaintiff submitted to the NYPO a bid covering a considerable quantity of powdered soap. The first page of the bid form, which was identical to the bid form involved here, allowed the Government 60 days for acceptance if the contractor did not specify a shorter period. In that bid, plaintiff allowed the Government 60 days for the acceptance of its bid, but plaintiff submitted a covering letter, which stated that the bid was based on the market price of tallow on the date the bid was submitted. The letter further stated that if the contract was awarded to plain *651 tiff, it would require the Government to insert in the contract an escalator clause specifying that the amount payable to the contractor would be based on 125 percent of the cost of tallow as shown by Pratt’s Daily Keport. Plaintiff’s bid was not accepted.
17. During the period October 8,1947, to August 1, 1949, plaintiff was the successful bidder on seven contracts for soap and soap products which were awarded on bids submitted to the NYPO. One of these was a negotiated procurement, and for the others the periods which plaintiff allowed for acceptance of the bids were as follows: 5 days, 10 days, 20 days, 20 days, 80 days, and 20 days. The number of days which intervened from the date of opening to the date of award on these contracts was as follows: 8 days, 10 days, 17 days, 17 days, 3 days, and 27 days, respectively.
18. The bid opening at the NYPO on May 19, 1947, was conducted by Lieutenant Zastrow, the bid officer, and was participated in by J. S. Macintosh, Procurement Specialist in the Chemicals Section, the commodity section which was interested in the procurement of the soap. In 1947, the NYPO had a prescribed procedure governing the opening of bids, the abstracting of bids and the preparation of the notice of award. According to the recollection of the witnesses present at that time, that procedure was followed on May 19, 1947.
All' of the sealed bids, including those received by mail and those delivered personally by the bidder, were taken into the bid room by the bid officer. After announcing that the bids would be opened on the invitation involved here, the bid officer opened the envelopes containing the bids in the order in which they had been received. As each envelope was opened, the original bid was retained by Lieutenant Zastrow and the second and third copies were handed to Mr. Macintosh. The envelope from which the bids were removed was then thrown into a wastebasket. From the original, the bid officer then read aloud for the information of all present the pertinent data on the bid, including the time allowed for the acceptance of his bid, the delivery conditions, shipping point, price, quantity bid upon, and any qualifications placed by the bidder on his bid.
*652 Where a bid was accompanied by a letter, the contents of the letter were also read by the bid officer. The bid of the John T. Stanley Co. was accompanied by a letter which stated that the contractor proposed to ship the soap in a slightly different type of packing than specified in the invitation. This letter was read at the opening as a part of the Stanley bid. The pertinent information set forth on plaintiff’s bid form was read at the opening in the same way as in the case of the other bids submitted.
According to the recollection of all witnesses present at the bid opening, including Mr. Kamen, no covering or qualifying letter from plaintiff was read at the opening in connection with plaintiff’s bid. Mr. Kamen, who remained throughout the proceeding, did not mention that a letter had been submitted with plaintiff’s bid, nor did he make any statement or protest in connection with the reading of plaintiff’s bid.
Plaintiff’s bid was the lowest of the seven received.
19. At the conclusion of the bid opening, the bid officer retained and took with him the original of each bid which he had used for the public announcement. Mr. Macintosh, the commodity section representative, took with him the second and third copies of each bid. The several copies of the bids were utilized in preparing and checking certain documents which were required before an award could be made or a contract executed. Among these documents was an abstract of all bids which was made by taking from the bids and entering on the abstract certain pertinent information, including the name and address of each bidder, the quantity bid upon, the contractor’s shipping point, the price, the proposed delivery schedule if different from that specified in the invitation, and the time allowed by each bidder for the acceptance of his bid. After the abstract was prepared, the information thereon was verified by the bid officer who compared it with the original bid in his possession. He then affixed his signature to a certificate which stated that he had personally opened and read all bids, had verified the entries on the abstract, and had found them to be correct. The two copies of the bids, which were retained by Mr. Macintosh, were checked by personnel in his section for the *653 preparation of the approval of the award to be submitted by the contracting officer to the Quartermaster General, as required on all contracts in excess of $100,000. The particular information which was set forth in the covering letter submitted with the bid of the John T. Stanley Co. was abstracted along with other information contained in the bid submitted by that company. However, no reference to a covering letter, claimed to have been submitted by plaintiff with its bid, was made in either the abstract of bids or the approval of the award. These documents (in evidence as defendant’s exhibits 8 and 12) show that the time allowed for the Government to accept plaintiff’s bid, as stated in the bid itself, was 60 days. Likewise, there was no reference in the abstract to the phrase “as scheduled or better”, which plaintiff inserted in its bid under the heading “Delivery Proposed.”
After the abstract and approval of the award had been prepared, the contracting officer compared the abstract with the bids and signed it and the memorandum to the Quartermaster General covering the approval of the award.
20. There is a conflict in the testimony of defendant’s representatives as to the disposition of covering letters after the conclusion of the bid opening. The bid officer stated that where there was only one copy of such a letter, it was the practice to give the letter to the buyer (Mr. Macintosh in this instance) and to make a notation on the original bid to the effect that a letter had accompanied the bid. Mr. Macintosh testified that if a covering letter was submitted with the bid and there were no copies of the letter with the duplicate and triplicate copies of the bid, the letter would be retained by the bid officer with the original of the bid and that the contents of the letter would be shown in the abstract. Mr. Fitzgerald, an employee in the abstract section, stated that after the bid opening the covering letter would be sent to the contracting officer.
21. Since the contracting officer had to obtain the approval of the Quartermaster General in Washington before the award could be approved, the contracting officer telephoned the Washington office on May 26,1947, and requested verbal approval of the award to plaintiff. Within 48 hours there *654 after, the contracting officer received notice by telephone that the award had been approved by the Quartermaster General. This effort to expedite approval of the award was in conformity with the policy followed by the Quartermaster General in connection with the bids received toward the end of the fiscal year. Such action was taken in order to make certain that the funds necessary for the contract could be obligated before the end of the fiscal year.
22. On May 28, 1947, nine days after the opening of the bids, Mr. Macintosh notified Mr. Kamen by telephone that plaintiff’s bid for the entire quantity of soap was being accepted and that a letter of award would follow. On May 29, 1947, which was exactly 10 days after plaintiff had submitted its bid, plaintiff received the letter of award, dated May 28, 1947, and signed by Lt. Col. Frederick Kuhn, the contracting officer.
The letter containing the notice of award stated that the shipments were to be made in accordance with the schedule specified on the invitation and that the destinations for such shipments would be shown on Vendor’s Shipping Documents to follow. The notice also stated that a formal contract would be forwarded under separate cover.
23. On June 12, 1947, plaintiff received a copy of the formal contract which was signed by the contracting officer. It was executed by Mr. Kamen on the same date. The contract, which is in evidence as defendant’s exhibit 6, contained the acceleration of delivery clause quoted in finding 7 and also set forth the same delivery schedule as provided for in the invitation. Among others, the contract contained the provisions usually found in Government supply contracts, including “Article 2, Changes,” “Article 5, Delays-Damages,” and “Article 11, Disputes.”
The executed copy of the contract was returned with a letter from plaintiff, stating: “We wish to take this opportunity to thank you for your valued order and assure you the same will be properly executed.”
24. By the time plaintiff’s bid was submitted, the prices on tallow had moved downward to the extent that the market was referred to in the soap trade as a downward or dull market. As stated in finding 9, the market price of tallow *655 on May 31, 1947, was 12% cents per pound. The market price remained at that point until June 13, 1947, when it declined to 11% cents per pound. It remained at that price throughout the balance of June, the whole of July, and until August 29,1947, when it increased to 12% cents per pound. On September 8, the price advanced to 13% cents per pound and there were successive increases thereafter during September until the market price reached 19% cents per pound on September 30,1947.
The practice in plaintiff’s industry and among other large consumers of tallow was to buy the product on firm contracts at currently quoted prices with future shipping dates, usually 30 to 60 days. The price was not paid by the buyer until the tallow was delivered at the designated delivery point. Thus a tallow purchaser could buy at prices quoted on June 1 with provisions for shipment on August 1 and payment at the June 1 order price at the time of delivery. Most of plaintiff’s tallow purchases were made in tank or car lots, each tank or car containing approximately 60,000 pounds.
25. On May 16,1947, plaintiff submitted to the Veterans’ Administration a bid, to be opened on May 19, 1947, for supplying that agency about 924,480 pounds of soap by July 15, 1947. Had plaintiff’s bid been accepted in its entirety, the production of soap under that contract would have required the use of about 600,000 pounds of tallow. Plaintiff specified that the bid was to be accepted in 10 days, but at the request of the Veterans’ Administration plaintiff extended the time for the acceptance to June 13,1947, on which date plaintiff was awarded a contract for 580,340 pounds of soap products, but plaintiff did not receive notice of this award until June 16, 1947. The soap was to be delivered by July 15, 1947, and its production required the use of more than 400,000 pounds of tallow. At the time plaintiff’s bid was submitted, plaintiff was also selling and producing soap for other customers.
As of May 19,1947, plaintiff had obligated itself to deliver soap, requiring the use of about 100,000 pounds of tallow, to commercial customers early in June. Plaintiff’s soap sales, other than to the Veterans’ Administration, during June 1947 entailed the use of more than 150,000 pounds of tallow. *656 Commitments for all or substantially all these sales had, in all probability, been made by plaintiff on or prior to June 18, 1947.
As of June 16, 1947, plaintiff’s total tallow requirements for the commercial sales to be delivered in June and for the two Government contracts mentioned above aggregated more than 2,400,000 pounds.
26. Plaintiff’s plant in Barberton, Ohio, had a storage capacity of 500,000 pounds of tallow. As of June 6, 1947, the plant inventory included 300,944 pounds of tallow.
On May 16, 1947, plaintiff ordered two cars, amounting to 120,230 pounds of tallow, for delivery during the second half of June 1947. On May 27, 1947, plaintiff ordered two more cars, totaling 122,700 pounds of tallow, for delivery in June 1947. Some time prior to May 1,1947, plaintiff had ordered two cars of tallow for delivery in May, but the tallow, amounting to 120,860 pounds, was delivered, one car on June 20, 1947, and one on June 28, 1947. Since this tallow was ordered before plaintiff submitted its bids to the Veterans’ Administration and to the NYPO, the tallow was apparently intended for the manufacture of soap for commercial customers.
The tallow on hand plus that ordered for delivery in June amounted to 543,874 pounds. If the tallow ordered in May for June delivery had been received as scheduled, plaintiff’s total tallow supply during June would have amounted to 664,734 pounds.
On June 11, 1947, plaintiff ordered four cars of tallow, amounting to 239,955 pounds of tallow, for delivery in the period July 7 to July 28,1947. On June 13,1947, three days prior to the time that plaintiff received notice of the Veterans’ Administration award and the day following the execution of the contract involved here, plaintiff placed an order with Swift & Co. for 15 cars or 899,595 pounds of tallow. The order called for the delivery of seven cars in July 1947 and eight in August 1947.
Thus, as of June 16, 1947, plaintiff’s outstanding orders for undelivered tallow plus its inventory aggregated 1,804,-284 pounds of tallow, as against commitments requiring the use of more than 2,400,000 pounds of tallow.
*657 27. None of the tallow plaintiff ordered in May for delivery in June was received until July 14, 1947, when one car was delivered. The remaining three cars were received on August 1, August 4, and September 3,1947.
The two cars which plaintiff had ordered in April and received late in June 1947 were purchased at a cost of 22% cents per pound for one car and 26% cents per pound for the other. None of this tallow could have been used to make soap for the contract in suit except at a substantial loss to plaintiff.
By letters, which are in evidence as defendant’s exhibits 26 and 101, plaintiff and its attorneys stated that the 300,944 pounds in plaintiff’s inventory of June 6,1944, were intended for use on the Veterans’ Administration contract. Plaintiff was obligated to complete delivery of soap for that contract by July 15, 1947, but the first shipment was not made until June 25, 1947, and the last shipment occurred on September 25,1947.
The tallow in inventory and the two cars received late in June were insufficient, to the extent of not less than 128,196 pounds, to produce the soap for the Veterans’ Administration contracts and to fulfill plaintiff’s commercial commitments for June 1947.
In June 1947, plaintiff had no tallow on hand that had been acquired to manufacture soap for the contract involved in this suit.
28. Of the 19 cars of tallow which plaintiff ordered in June for delivery during July and August 1947, five were delivered in July, five in August, and five in September 1947. The remaining four cars were resold by plaintiff to the Iowa Soap Co. in September and October 1947.
During July 1947, plaintiff’s plant received six cars of tallow, the first car being delivered on July 9, 1947. On or about July 15, 1947, plaintiff had tallow on hand which could have been used to manufacture soap for the contract in suit.[2]
*658 29. Plaintiff did not order any tallow during July and August 1947.
Plaintiff’s orders for the 23 carloads of tallow were made in the period May 16 to June 13,1947, at a time when tallow was freely available and the trend in the market price was downward. Early in September 1947, plaintiff attempted to order tallow from Swift & Co. That producer, apparently anticipating the rise in price that occurred later in the month, telegraphed plaintiff on September 2 and again on September 3, 1947, that it was not making any offers of tallow for October shipment.
Between September 10 and September 20, 1947, plaintiff ordered 10 cars of tallow at prices considerably above those which had prevailed in May and June. One car was to be shipped immediately, while the remaining nine cars were to be delivered in 30 days or at seller’s option in October. Five cars were ordered from Swift & Co. and five from other suppliers. Five of the cars were received in October 1947. Two cars, which had been purchased at 18% cents per pound, were resold by plaintiff in November at 22 cents per pound. One car purchased at 19% cents per pound was resold by plaintiff in November at 25% cents per pound. Also, two cars purchased at 19% cents per pound were resold by plaintiff in November, one at 22% cents per pound and one at 23% cents per pound.
30. With the claim plaintiff submitted to the General Accounting Office on July 12, 1948, plaintiff attached an accountant’s report showing that during the period from June 2 to September 26,1947, plaintiff consumed 1,555,285 pounds of tallow in producing soap products for the Veterans’ Administration contract, for commercial customers, and for State and Federal agencies other than the Quartermaster Corps. According to the report, the tallow so used consisted of the inventory of tallow on June 6, 1947, and 19 cars received in July, August, and September 1947. The 19 cars listed were 18 of the 23 cars ordered by plaintiff in May and June 1947, and one car ordered on September 10, 1947, for immediate delivery.
In this action, plaintiff claims that the Government’s failure in June and July 1947 to furnish shipping documents, to *659 provide information needed for marking shipping containers, and to supply inspection service compelled plaintiff to defer delivery of the tallow ordered in May and June. Plaintiff also says that after the Government breached the contract, plaintiff was forced to seek new business and to sell soap produced from the tallow ordered for the contract at a loss. However, in its claim of July 12, 1948, plaintiff did not assert that the Government’s breach of contract had compelled plaintiff to postpone delivery of the tallow purchased for the contract. Plaintiff at that time claimed that:
•i» V *1*
Since the Government failed to accept delivery as required under the subject contract, and in view of the tremendous inventory of tallow purchased for use on this contract, which had to be paid for in cash in advance, and in further view of the fact that our plant and storage facilities were so overcrowded that we could not continue production, we were forced to dispose of same in the form of soap to other purchasers, mostly other Government and State Agencies, as well as Municipalities at below actual cost, thus sustaining a loss amounting to $106,256.70 (One Hundred Six Thousand Two Hundred Fifty-Six Dollars and Seventy Cents). This action became necessary so that we could liquidate this tremendous inventory and thus be able to meet the regular and ordinary expense of the company. (Exhibit A) (C. P. A. Report). Although report shows dates of shipments, actual contracts were taken prior to said dates of shipment.
Among the “other purchasers” listed in the attachments to the claim was the Veterans’ Administration, which awarded the contract to plaintiff on June 13,1947, the date on which plaintiff ordered the 15 cars of tallow described in finding 26.
31. Throughout the period involved in this suit, there were frequent communications between plaintiff’s New York office and its Barberton plant by teletype. Plaintiff has preserved the original teletype messages and no question has been raised as to their authenticity.
A number of the teletype messages provide pertinent evidence on various phases of this controversy.
*660 Plaintiff received its copy of tbe invitation to bid on tbis contract at its New York office on May 13,1947. Mr. Kamen was at the plant in Barberton on that date, and the New York office sent a teletype message to him at Barberton stating that the invitation to bid on the Quartermaster contract had been received and that the soap would have to comply with Quartermaster Corps Specification JCQD No. 27. On May 14, 1947, plaintiff’s New York office telephoned its Barberton plant asking if Barberton had received the specifications on this bid forwarded from New York. On May 27,1947, the New York office sent a teletype to Mr. Johnson, the plant manager, asking his suggestions relative to the purchase of six cars of tallow available at one cent above market quotations. In reply Barberton asked if the tallow was for future delivery, stated that the two cars of tallow then on order would take care of the plant for another month, and that it was believed that tallow could be purchased at market prices when the plant was ready for it. On May 29, 1947, the day after the contract was awarded to the plaintiff, Barberton teletyped the New York office that a 3,000-pound experimental batch of soap, conforming to Specification JCQD, had been produced in the plant.
On June 2, 1947, Barberton sent New York a teletype message, stating that Barberton needed a copy of the contract in order to order bags and obtain information for having the bags printed. New York replied that it had the contract but not the contract papers. It requested Barber-ton to forward certain information shown on the bid.
Again on June 3, 1947, Barberton, by teletype to New York, requested a copy of the contract. On the same day, the New York office replied that it would obtain a copy of the contract for Barberton.
32. The contract specified that the domestic half of the soap to be produced under the contract should be packed in kegs, fibre-board drums, plywood drums, or multi-wall paper bags having a net content of not more than 100 pounds. The export half of the soap was to be packed in 50-pound or 100-pound bags. The contract provided that both the export and domestic shipments could be packed *661 in single-trip metal drums having a net content of not more than 200 pounds.
Both the invitation and the contract provided that the shipping containers were to be marked in accordance with Quartermaster Corps Specification No. 94A. This standard specification applied to all procurement by the NYPO and was available to any bidder or contractor at any time on request. The printing or marking of the entire quantity of both domestic and export containers was identical, except for the name and address of the consignor and the consignee. This latter information, as shown below, was not needed prior to the time of shipment and varied in accordance with the size and destination of the shipment. Bags, which had been purchased and printed for use on similar contracts, could be used by changing the stock number and purchase order number to conform to the numbers set forth in this contract.
The evidence shows that plaintiff intended to use bags for both export and domestic packing, and that, except for one emergency shipment, all the soap delivered under the contract was shipped in bags. On May 29, 1947, the date the notice of award was received, plaintiff had or could have obtained quickly all the information needed to procure a complete supply of printed bags for both the export and domestic pack.
33. Specification 94A required that stencils, labels, or other marking showing the name and address of the consignor and the consignee be placed on each container in export shipments moving by water carrier and in domestic shipments of less than one car load. On domestic car-load shipments, this additional marking was to be placed on only 8 to 10 bags, stacked near the car door. The information as to the name and address of the consignor and consignee was available only on the bills of lading and Vendor’s Shipping Documents to be supplied by the defendant. Therefore, before plaintiff could ship the soap, it had to have the bills of lading and shipping documents applicable to the particular shipment in order to obtain the consignor-consignee markings, which were affixed to the bags by stencils or tags.
*662 34. As stated in. finding 31, plaintiff’s Barberton plant sent the New York office a teletype message on June 2,1947, requesting a copy of the contract for use in ordering printed bags. On June 6, 1947, Barberton was advised by teletype from New York that plaintiff had not been able to obtain information respecting the printing of the bags, except that the printing would have to comply with Quartermaster Specification 94A. At the request of the Barberton office, Mr. Kamen called on Mr. Macintosh on June 8, 1947, and obtained a copy of this specification for mailing to Barberton. On June 23,1947, Barberton sent New York a teletype message requesting the specification number for the export bags. This information, which appeared in the documents accompanying the invitation for bids, was supplied by teletype from New York to Barberton on the same day.
No bags were ordered by plaintiff in June and on July 3, 1947, Barberton inquired by teletype as to what progress had been made in procuring both domestic and export bags for the contract. When New York replied that it had no information regarding the bags, Barberton stated the time was getting short and inquired whether it (Barberton) should take steps to obtain the bags. The office replied that the plant’s inquiry would be answered when Mr. Kamen returned.
At the time the contract was executed, plaintiff had at the Barberton plant an adequate supply of 35-pound bags, which met the requirements of the contract with respect to the domestic pack. The fact that these bags could be used for domestic shipments was not ascertained by Mr. Kamen until July 16, 1947, when he met with Mr. Macintosh; such information was not sent to the plant until August 6, 1947, when Barberton inquired by teletype whether the 35-pound bags could be used for the domestic pack.
However, plaintiff had no bags which could be used for the export pack and did not place an order for these bags until July 16,1947. The order specified that the bags should be delivered by August 15, 1947, but at plaintiff’s request, the delivery date was later advanced to October 1,1947. The supplier delayed shipment of the bags pending a credit in *663 vestigation, so that the bags needed for the export half of the shipment were not received until November 1947.
35. The contract provided that when the soap was ready for shipment, plaintiff should notify the headquarters of the Quartermaster Inspection Service in New York City. On or about July 8, 1947, plaintiff’s contract was referred to the area supervisor in Chicago, Illinois, since plaintiff’s plant was located within the territory served by the area supervisor. On that date, i. e., July 8,1947, the area supervisor addressed a letter to plaintiff’s plant in Barberton, stating that he planned to visit the plant on July 11, 1947, to discuss arrangements for inspecting, packing, marking, and shipping the soap to be supplied under the contract.
The evidence does not show when the area supervisor first visited the plant, but on July 14, 1947, he assigned the inspection work under the contract to Peter Carr, an inspector under his jurisdiction. Mr. Carr promptly advised plaintiff of his assignment and gave the address at which he could be located when inspection services were desired. On July 23, 1947, Mr. Carr, who had not heard from plaintiff, telephoned plaintiff’s plant engineer to inquire when production of the soap for the contract would begin. In reply, the manager stated that plaintiff would not be ready for a few days, whereupon Mr. Carr advised that he would be in Bar-berton on August 1, 1947, and left information regarding the places at which he could be reached during the meantime. When Mr. Carr arrived at the Barberton plant on August 1,1947, plaintiff’s manager stated that he would soon be ready to produce soap. At that time, Mr. Carr had already arranged an inspection trip to the plants of several widely scattered contractors, and he immediately departed on this inspection tour. However, he left information about where he could be located during the trip.
On August 4, 1947, plaintiff started production of soap for the contract and promptly notified Mr. Goodman, the area supervisor, that inspection services were needed. Mr. Goodman went to the plaintiff’s plant in response to this message, and on August 7, 1947, he notified Mr. Carr that his services were required at the Barberton plant. Mr. Carr arrived there on August 8, 1947, at which time a batch of *664 soap, consisting of approximately 60,000 pounds, had been manufactured and was ready for inspection.
36. The contract provided that the contractor was required to comply with all of the instructions set forth in shipping documents to be supplied by the Government. The shipping documents consisted of bills of lading for the transporting carrier and Vendor’s Shipping Documents, which designated the specific depot or port as the consignee to which the soap was to be shipped and also set forth the total quantity of export or domestic pack or both that was to be shipped to the consignee named.
The Vendor’s Shipping Documents, hereinafter referred to as VSD’s, were based on directives issued by the office of the Quartermaster General to Mr. Macintosh, the Procurement Specialist in the NYPO. The directives detailed the depots to which the soap was to be shipped and specified the quantity and type of packing for each shipment. Upon receipt of the directives, Mr. Macintosh requested the issuance of the VSD’s and bills of lading, which were prepared in other sections of the New York office. After such documents were prepared, they were sent directly to the plaintiff and handled by plaintiff and its personnel, either at New York or at the Barberton plant.
Plaintiff could not ship any soap under the contract without VSD’s and bills of lading. These documents not only provided the information needed for shipment but also that required for marking the shipping containers to the extent hereinbefore described.
37. On a number of occasions during the months of June and July 1947, Mr. Kamen and other employees of plaintiff’s New York office requested Mr. Macintosh to supply shipping documents but were unable to obtain them. The requests were verbal and were made in the course of visits to the office of Mr. Macintosh or .by telephone. Mr. Macintosh informed plaintiff’s representatives that on account of the lack of storage facilities, shipping documents could not be issued in advance of the dates provided in the shipping schedule of the contract.
38. The first reference to shipping documents in the teletypes occurred on July 28, 1947, when the Barberton plant *665 informed the New York office that shipping documents would be needed early during the following week. The message requested the New York office to request the Government to mail the shipping papers to the plant.
Plaintiff began production of soap for delivery under the contract on August 4, 1947. After further requests by the plant for VSD’s the first shipping documents were issued by the NYPO on August 8 and received at the plant on August 11,1947. The first shipment was made the same day.
From August 5 through August 9, 1947, there was some delay due to lack of sufficient tallow in the plant.
Although shipping documents were furnished from August 11 to August 26, 1947, errors in one set resulted in an overshipment. In another instance, there were not enough bills of lading for the VSD’s. On August 26, 1947, there was a shortage of VSD’s and this delayed a shipment for two days. After August 28, 1947, there were no delays for lack of shipping documents, since plaintiff had shipping documents in its possession greatly in excess of shipments made.
During the period August 8 to November 19, 1947, the Government issued and delivered to plaintiff VSD’s covering the entire quantity of soap to be shipped under the contract.
Plaintiff produced and shipped a total of about 400,000 pounds of soap in August, September and October 1947. No shipments were made in November and December 1947.
All shipments made in 1947 were to domestic destinations, except one emergency export shipment of 1,250 pounds, which was loaded in September 1947. Although plaintiff had sufficient VSD’s to cover the entire export pack by November 1947, the inspector required plaintiff to ship in accordance with the numerical order of the VSD’s. As a result, practically all of the soap which plaintiff produced in 1947 went to domestic consignees. While VSD’s were available at the time stated above, the evidence does not show when in 1947 plaintiff received export bills of lading for the export VSD’s.
39. As a practical matter, plaintiff could not commence the large scale production of soap without having a supply of shipping documents available from day to day in sufficient quantities to cover the daily plant production. The equipment for the manufacture of the soap was designed to oper *666 ate on a continuous production cycle from tallow in the tank car to the loading of the finished product in the freight cars. In an 8-hour period, the plant could produce a carload of soap or about 40,000 pounds. Each car shipped contained from 40,000 to 50,000 pounds of soap. Approximately 60 cars were required to’ transport all the soap called for in the contract.
The plant’s capacity for storing the soap was equivalent to only two or three cars of soap.
Although the plant had facilities for spotting from 25 to 28 cars on the siding at a time, plaintiff would have incurred demurrage charges had the railroad cars been used for storage. Storage in the cars for extended periods of time would have violated regulations of the Interstate Commerce Commission.
Had the soap been manufactured and stored during humid months, it probably would have absorbed moisture in excess of the moisture tolerance permitted by the specifications.
40. Beginning on August 29,1947, the price of tallow rose sharply, starting at 12% cents per pound on that date and rising to 19% cents on September 30, 1947. This sharp increase was largely due to the fact that on September 11, 1947, the Government, through the Department of Agriculture, announced export allocations of fats and oils for the fourth quarter of the year which exceeded by 276 million pounds the allocation for the same quarter of the preceding year. Word of the proposed increase in exports may have reached the trade in advance of the official announcement, because a sharp upward movement in the domestic prices of tallow and other fats and oils started about two weeks before the announcement was made.
41. Prior to September 30, 1947, neither Mr. Kamen nor any other representative of plaintiff had ever discussed plaintiff’s contract with the contracting officer or communicated with him in any way regarding the contract. On that date, however, plaintiff wrote the contracting officer a letter, which was signed by Mr. Kamen as president of the company. The letter read in pertinent part as follows:
We respectfully refer to the above order and request your immediate consideration to delay delivery or in *667 crease the price of soap under this contract as it is working a tremendous hardship on our company.
Due to the fact that the Government in its desire to help the people of the world has recently increased the allocation of fats and oils for export, the price of fats and oils used in the manufacture of the soap covered by the above order has increased to practically double the price available at the time this contract was awarded to us. Please note the figures attached.
It is our understanding that the Government never intended to work hardships on contractors, and that when it can be shown that a hardship does exist on the contractor through conditions beyond his control, the Government should modify the contract that would release the contractor from undue suffering under “Procurement Regulations 8-352 — Standard Delays-Damages Article.”
Enroute to the contracting officer, the foregoing letter passed through the hands of Mr. Macintosh, who initialed it and added an endorsement in his handwriting which read “Merits consideration.”
42. Mr. Kamen conferred with the contracting officer early in October, after the above-described letter had been written, and again urged an increase in the contract price on the ground that the Government’s export program for fats and oils was responsibile for the sharp rise in tallow prices. The contracting officer stated that he had no authority to change the contractual obligations of the parties and that plaintiff would have to comply with the delivery schedule in the contract.
The position taken by the contracting officer during these conferences was reiterated in a letter written to plaintiff on October 13, 1947, when the contracting officer suggested that plaintiff submit a specific presentation of its claim, showing the actual loss to be incurred by plaintiff and containing a brief statement as to why plaintiff had not covered itself with the necessary basic raw materials after the contract had been awarded to it. Colonel Kuhn requested plaintiff to include in its letter any material that would substantiate or clarify its claim.
43. Plaintiff replied to the contracting officer by letter of October 31,1947, wherein plaintiff again contended that the *668 Government’s increased export allocations of fats and oils had caused the domestic increase in the price of tallow and stated that it was difficult and practically impossible for plaintiff to comply with the contract, because the price of tallow was double the amount plaintiff had anticipated when the contract was executed. In reply to the inquiry as to why plaintiff had not covered itself with basic raw materials at the time the contract was signed, the letter stated:
Jfc }Ji #
Regarding your question to explain what effort we made at the time the contract was made to cover ourselves, we wish to state that it has always been a practice and policy in this industry to purchase tallow for 30 to 60 days future. We have not been able to purchase beyond that date, and we have documentary evidence such as telegrams from the large packing concerns who were able to take care of us for 60 days at the time the contract was made in May. It should be noted, however, at this time that your contract made in May stated that delivery was not to start until August, and so we were not able to cover our August requirements for fats and oils until July. When we attempted to buy material in September for October and November, the packing companies would not submit any offers.
* * * * *
44. On November 7,1947, plaintiff supplemented its previous communications to Colonel Kuhn by a letter signed by Mr. Kamen, which read in part as follows:
We are informed that subsequent to the issuance to us of the above purchase order the Government suddenly made unusually large allocations of fats and oils for export and issued an unusually large number of export licenses for the shipment abroad of these items; furthermore, the Government itself made substantial purchases of these items through its various Bureaus and Agencies. This action resulted in (a) increasing the price of fats and oils by about 100% to 150% over the price, that existed at the time the bid was made, and (b) in seriously depleting the available supply with the resultant scarcity of these materials for domestic use and manufacture.
At the time that our bid was accepted it was impossible for us either to foresee the foregoing conditions or to make total advance purchases necessary for the comple *669 tion of the contract. Inasmuch as the contract called for deliveries of the finished product (soap) in installments over a period of five (5) months, it would have been most unbusinesslike and imprudent for us to tie up our funds in total purchases or to acquire storage facilities to store these items. Installment deliveries and conservative operations made the method we adopted for performance of the contract sound and mandatory. Besides, it is quite generally known that because of the limited available supply of fats and oils, suppliers have refused to make commitments to purchasers of unusually large quantities of these basic materials. The purchasing record of the customer is used as a yardstick by our suppliers to determine the quantity which may be made available to customers. Consequently, even if an effort had been made to acquire the materials in advance for the completion of the contract, such effort would undoubtedly have been entirely abortive.
We are quite certain that were it not for the conditions created by the Government in making the allocations and purchasing these basic raw materials, resulting in the conditions above mentioned, there would have been no necessity for requesting any delay and the contract would in all respects have been fulfilled.
45. By letter of November 21, 1947, the contracting officer advised plaintiff that its contentions did not constitute excusable causes of delay within the meaning of the contract; that his office had no authority to grant an increase in the contract price for the reasons relied upon by plaintiff, and that plaintiff was obligated to make deliveries in accordance with the delivery schedule and at the prices set forth in the contract.
About December 8, 1947, Colonel Kuhn was detailed to another assignment and had no further discussions or communications with plaintiff regarding its claim. During the conferences and in the course of the correspondence between Colonel Kuhn and Mr. Kamen within the period from September 30,1947 to December 8,1947, no contention was made by Mr. Kamen that the plaintiff had undertaken to accelerate deliveries under the contract but was prevented from doing so because of the Government’s failure to supply the necessary shipping documents, nor did Mr. Kamen claim that plaintiff’s bid had been qualified by a covering letter, which *670 indicated that plaintiff intended to accelerate its deliveries under the contract.
46. On December 8, 1947, plaintiff, through its president, Mr. Kamen, again wrote the contracting officer a letter which was intended as an appeal from the decision of November 21, 1947. The letter requested that plaintiff be allowed to delay the deliveries of soap under the contract until the prices of fats and oils receded to the level existing at the time the contract was executed or that plaintiff be granted an increase in the contract price to 27 cents per pound. The letter repeated in detail the plaintiff’s previous assertions regarding the effect of the Government’s increased export allocations of fats and oils on the tallow market. In addition, plaintiff, for the first time, contended that it had intended to accelerate deliveries under the contract and would have completed such deliveries prior to September 12, 1947, had it not been for the failure of the Government to supply the necessary shipping documents and inspection service. With respect to such contentions, plaintiff’s letter stated:
*[» sf* «H
Formal contract No. W30-280-Qm-~5028 was sent to us on May 28th, 1947. The contract also contained the acceleration clause as follows: “The Contractor is requested to accelerate and increase the deliveries to any extent, providing the total of such accelerated a/nd increased deliveries does not exceed the total quantity stipulated herein.” Please permit us to state that had it not been for this clause we would absolutely not have submitted this bid.
The total amount of fats required to complete this contract was 1,500,000 lbs. or approximately twenty-five tank cars. The price of tallow on May 28th was .12 and .13 cents per pound and continued at that price until September 15th, 1947. (See Exhibit A — Pratts Reports.)
On May 28th, we had on hand and on contract with suppliers approximately ten tank cars of fats and oils, and on June 13th we purchased 15 additional tank cars. (See Exhibit B — Swift Contract.)
Immediately upon receiving the award we requested shipping instructions, inspection arrangements, VSD’s as well as Government Bills of Lading from your department. After many attempts, early in August we were finally told that because of the lack of space at the *671 depots it would not be possible for the Government to take any part delivery prior to August. Mr. A. L. Kamen, Mr. M. N. Kamen, Miss M. R. Weissman, and Mr. H. Shapiro, all of our office, continued in our efforts to obtain shipping instructions during May, June and July, but could not get any until August 10th. No inspector was assigned to our plant until August for inspection and release shipments although the contract was awarded May 28th. (See Exhibit C — Affidavits.)
Due to the failure of the Quartermaster to supply us with the necessary inspection and releases in accordance with our contract, we had to manufacture the fats and oils on hand into other types of soap and sell the soap to other Government Agencies, State and City Departments.
During the month of September, we attempted to purchase new fats for October shipment, but we were refused by our supplier, Swift & Co. (Exhibit D— Telegram from Swift.)
It should be noted that fats and oils are shipped in 60,000 lb. tank cars and while we have sufficient storage space to take up five cars of fats, it is not practical nor economical to take in more at one time.
Had the Quartermaster complied with the Acceleration Clause in the Contract, and furnished us with V. S. D.’s and released the soap as manufactured by us, we would have completed the contract prior to September 12th, as we intended to when we submitted our bid. At that time the Government through its agencies announced a new sudden policy to increase Export Allocation and also make direct purchase of fats and oils. This announcement caused prices to increase from 12 cents per lb. to 27 cents per lb. (Exhibit E — Opinions)
* * * * *■
47. Plaintiff’s appeal of December 8, 1947, was acknowledged by the Legal Division of the NYPO, which notified plaintiff that its appeal would be forwarded to higher authority. On December 23, 1947, Col. Herbert R. Watson was appointed as the successor contracting officer for this contract.
48. During the period between January 8,1948, and April 29, 1948, Mr. Kamen and his attorneys conferred on several occasions with Colonel Watson, Mr. Macintosh and a representative of the Legal Division of the NYPO concerning plaintiff’s claim and its failure to comply with the delivery *672 schedule of the contract. Several additional letters were exchanged between the parties on the same subject.
On April 29, 1948, while plaintiff’s appeal was pending before the War Department Board of Contract Appeals, Colonel Watson, the contracting officer, wrote plaintiff, stating that its right to deliver the remainder of the soap called for under the contract had been terminated pursuant to Article 5 of the contract entitled “Delays-Damages.” The letter further stated that the Government would purchase the undelivered quantity pursuant to the terms of the contract and that any excess cost would be charged against plaintiff. At the time of termination, plaintiff had delivered a total of 490,589 pounds of soap, leaving 1,699,402 pounds undelivered and delinquent.
On May 7, 1948, Mr. Kamen attended a conference in the office of the contracting officer, at which time it was agreed by both parties that plaintiff would continue deliveries of the uncompleted portion of the contract, commencing on May 24, 1948, and would deliver at the rate of not less than 600,000 pounds of soap per month until the full quantity was delivered. It was also agreed that plaintiff would withdraw its appeal without prejudice to its right to file a claim for damages with the General Accounting Office. It was further understood that the contracting officer would rescind the termination notice upon a showing by plaintiff that it had made arrangements for a sufficient supply of tallow to complete the contract. On May 10,1948, documents effecting these agreements were executed by both parties, and the balance of the soap was thereafter delivered by plaintiff.
49. On June 8, 1948, the plaintiff sent the contracting officer a letter, which was directed to the attention of Mr. Macintosh and read as follows :
Due to the enormous losses we have suffered in making deliveries under this contract, we have been forced to apply for an additional loan from our bank, the First Central Trust Co. of Akron, Ohio.
In applying for said loan we informed the bank that we did offer to make deliveries of the soap called for in the subject contract in June and July, 1947, and that *673 such offers could not be accepted by tbe Government because of lack of storage facilities.
Tbe bank has requested before considering said loan, that this fact be substantiated.
It would be appreciated if you could furnish us with such a letter, corroborating the above fact.
On the same day, Colonel Watson, the contracting officer, replied as follows:
In reply to your letter of 8 June 1948 regarding your Contract W30-280-QM-5028, due to lack of storage facilities in Government Army Depots, deliveries of the soap could not be accepted as offered by you in June and July 1947.
Permission has been granted to you to complete deliveries under the subject contract starting week of 24 May 1948 and to be completed at the rate of 600,000 lbs. per month.
This letter is furnished you to be used in connection with your application for a loan.
50. By letter of July 13, 1948, plaintiff forwarded to the contracting officer plaintiff’s claim which was addressed to the General Accounting Office. The claim was dated July 12, 1948, and is in evidence as plaintiff’s exhibit 56-A. Plaintiff’s claim was for reimbursement of losses amounting to $261,610, which allegedly resulted from (a) losses sustained in the disposal of tallow procured for use on the contract and sold elsewhere because of the Government’s failure to accept deliveries in accordance with the acceleration-of-delivery clause of the contract, and (b) losses occasioned by the Government’s demand for deliveries of the soap at later dates and by its acts which caused an increase in the price of tallow.
In support of its first claim, plaintiff represented that it had relied on the acceleration-of-delivery clause in the invitation; that Mr. Macintosh had advised plaintiff, prior to the time the bids were submitted, that the contract authorized delivery immediately after the award; that plaintiff’s bid was submitted with the understanding that if the contract were awarded to it, vendor’s shipping documents, bills of lading, and an inspector would be supplied to plaintiff immediately following the award; that promptly after the award, plaintiff purchased a sufficient quantity of tallow to *674 manufacture all the soap called for in the contract and that plaintiff immediately began the manufacture of the soap so as to complete the delivery thereof in July 1947. The claim further stated that numerous requests for vendor’s shipping documents and for inspection service were made to Mr. Macintosh, who advised plaintiff that these requests could not be complied with because of the lack of storage space; that plaintiff protested this action and promptly advised Mr. Macintosh that unless the Government would accept immediate delivery, plaintiff would be compelled to sell the soap made from the raw materials to others at a heavy loss or file a petition in bankruptcy. The claim also stated that since the Government failed to accept delivery as required by the contract and in view of the tremendous tallow inventory purchased for use on the contract, plaintiff was forced to sell the tallow in the form of soap to other customers at a loss.[3]
There were attached to the claim numerous supporting documents, including an accountant’s statement of plaintiff’s losses, a copy of Colonel Watson’s letter of June 8, 1948, (finding 49) which had been furnished plaintiff for use in connection with its application for a loan, a statement of plaintiff’s plant inventory and tallow purchases, and copies of plaintiff’s contract with Swift and Co. for the purchase of tallow.
It was stated in plaintiff’s claim that neither vendor’s shipping documents nor the services of an inspector were furnished plaintiff until August 11, 1947; that plaintiff was informed at that time that if it failed to make deliveries as required, the Government would terminate the contract and hold plaintiff accountable for the additional cost of procuring soap from other sources; that the major portion of the shipping documents did not reach plaintiff until November 30, 1947; that on September 11, 1947, the Government, through the Department of Agriculture, suddenly increased the export allocation of fats and oils and thereby caused an increase in the cost of tallow from an average price of 12% cents per pound to 20 cents per pound in October, 25 cents in November, 26 cents in December, and 27 cents in January *675 1948; that since plaintiff had disposed of the tallow it had purchased for the completion of the contract, plaintiff was unable to purchase tallow from its regular suppliers and was compelled to go into the open market and buy tallow at a substantial loss in order to make shipments of soap in October 1947 and in February and March of 1948. Among other papers, there was attached to the claim a statement by the Department of Agriculture regarding the export allocations of fats and oils, telegrams from Swift & Co., and other data.
51. Plaintiff’s claim to the GAO was transmitted by the contracting officer to the office of the Chief of Finance, Department of the Army, on September 2,1948, with the report and recommendation of the contracting officer. This report, which is in evidence as plaintiff’s exhibit 55, summarized the representations made in plaintiff’s claim and, in addition, stated as follows:
With reference to the allegations made by the contractor, Mr. Macintosh, Government buyer, has been consulted and he has stated, as set forth in 1st Memo. Indorsement dated 28 July 1948, attached, that he has no recollection of having had any conversation with the claimant regarding delivery schedules. He did state, however, that after the award was made, representatives of the company made telephonic and personal visits to this office requesting shipping instructions. He believes that such visits were made during June and July of 1947 and that he then contacted General Supplies Branch, Supplies Division, Office of the Quartermaster General, by phone regarding the issuance of the YSD and was advised that due to the lack of storage facilities, authority to comply with the acceleration clause was declined. He does not recall the name of the individual in the General Supplies Branch, Supplies Division, OQMG, who gave him that information. However, he informed contractor that he must comply with the shipping schedule as outlined in the contract. Mr. Macintosh further states that VSDs were issued as follows: 7 August 1947, 22 August 1947, 26 September 1947, 4 November 1947, and 18 November 1947, and that contractor was delinquent throughout. It also appears that export allocations for the 4th quarter of 1947 were considerably increased which was announced to the public in September, and also that the Government did purchase a large quantity of tallow at that time. The records also inch- *676 cate that the price of tallow did increase considerably in September 1947.
J|t -f* V
As indicated in paragraph 20, it is the opinion of the undersigned that the Government breached its contract in refusing to accept accelerated deliveries and the contractor is entitled to provable damages therefor. _ It is therefore recommended that favorable consideration be given to contractor’s claim and that such damages be allowed as may be determined to have been caused by the breach. This office instituted proceedings for an audit in order to confirm or deny the figures submitted by contractor in its claim but has discovered that it would take approximately 3 to 5 months for a complete audit. In view of the contractor’s alleged precarious financial condition, and in order not to delay submission of this matter, it is requested that your office examine the claim and make a determination on the question of breach of contract. In the event it is considered essential that a specific amount be recommended, this office will make an audit, either by its own accountants, or through the Army Audit Agency, in order that a specific recommendation as to amount may be made.
Mr. Macintosh’s memorandum of July 23, 1948, which was referred to in the report of the contracting officer, was transmitted along with the latter’s report. The memorandum read as follows:
1. Reference paragraphs 2a and 2b, the undersigned has no recollection of having had any conversation with the claimant regarding delivery schedules.
2. Reference paragraph 2c, 2d, 2e and 2f, after award was made to the Kamen Soap Products Company, Inc., telephonic and personal visits to this office of representatives of the company were made requesting shipping instructions covering award. The undersigned has no recollection of how many calls or visits regarding the issuance of the VSDs or the exact dates of such calls or visits. It is believed that they were made during June and July 1947. No written requests were received in this office from the claimant requesting VSDs. During the time of these requests the undersigned contacted General Supplies Branch, OQMG, by phone, regarding the issuance of VSDs and was advised that due to the lack of storage facilities authority to comply with the terms of the directive “acceleration” was declined.
*677 The contractor was advised that he must comply with shipping schedule as outlined in the contract. The writer does not remember the name of the individual with whom contact was made regarding the acceleration of deliveries.
3. Reference paragraphs 2g, 2-h and 2i, records indicate that VSDs were issued as follows:
7 August 1947_ 440, 000
22 August 1947_ 440,000
26 September 1947_ 440,000
4 November 1947_ 440,000
18 November 1947_ 430,000
Contractor did not deliver quantities requested by VSDs and was delinquent throughout.
4. Reference paragraph 2j, to date the contractor has made deliveries in conformance with his promise made 10 May 1948.
On September 30,1948, the office of the Chief of Finance of the Department of the Army wrote plaintiff that its claim had been forwarded to the GAO for direct settlement.
52. On November 17, 1948, the General Accounting Office forwarded to the Chief of Finance of the Department of the Army a letter, which has been characterized by officers of the GAO as a development letter. In preparing the letter, the GAO did not make an independent investigation of the matters asserted in plaintiff’s claim, but issued the letter on the basis of the material set forth in plaintiff’s claim and the data transmitted by the Army, including the recommendations of the contracting officer and the Macintosh memorandum. The letter read in part as follows:
Therefore, it is apparent from the facts and circumstances that the contractor relied upon the request for acceleration contained in the contract to its detriment and that, when the Government refused or failed to accept deliveries of the soap when offered by the contractor in reliance upon the request, the Government forfeited its right to have further performance of the contract at the price specified therein. The contractor is thus entitled to whatever increased cost it was required to incur in the manufacture and delivery of the soap covered by the contract, not to exceed, however, the reasonable value of the soap determined upon the basis of the prices prevailing and being charged for similar soap at the time deliveries were made. Ac *678 cordingly, it is requested tbat a determination on such basis be made by the contracting officer as to the amount of increased costs to which the contractor is entitled by reason of having made delivery of the quantity of soap covered by the contract after it had been forced to dispose of the tallow, etc., purchased for use in the manufacture of same.
The contractor’s representatives recently called at this Office relative to the claim and urged prompt action in the matter, stating that if some action is not taken promptly to effect a settlement of at least a part of the amount for which claim is made by reason of the Government’s breach, it might be forced into bankruptcy and be compelled to close down its plant which now is engaged in manufacturing materials for delivery under other Government contracts. In view thereof, it is requested that a determination be made by the contracting officer as promptly as possible as to some partial amount which safely may be allowed the contractor pending a final determination as to the full amount which may be allowed and that, pending the final report to be made in the matter, an intermediate report be furnished with respect to such amount, together with a citation to the appropriation from which payment should be made. Upon receipt of such report this Office will give consideration to the allowance of the amount so determined to be due.
The contractor is being advised of the action taken herein.
By letter of November 17, 1948, the General Accounting-Office advised plaintiff that the contracting officer had been requested by it to furnish a determination as to the amount which might probably be allowed on plaintiff’s claim, pending completion of a final audit.
53. On August 28,1948, plaintiff requested Colonel Watson to furnish a statement regarding plaintiff’s pending claim in order that plaintiff might use the letter in connection with its application to the Eeconstruction Finance Corporation for a loan. On the same date, Colonel Watson wrote plaintiff, stating that plaintiff’s claim had been filed and forwarded through channels to the General Accounting Office with the contracting officer’s recommendation that favorable consideration be given to the claim. The letter further stated that the General Accounting Office was the sole Gov- *679 eminent agency authorized to settle such a'cl aim and that the letter should not be construed as a waiver of any of the Government’s rights under the contract.
54. From November 1946 until the end of December 1949, the NYPO was under the command of Gen. L. M. Grice. The New York office was a multiple procurement office which had from 10 to 30 contracting officers under the command of General Grice.
As a general rule, any matter which involved a major question of policy or presented unusual difficulty was brought to the attention of General Grice, but it was not until December 1948, after the GAO had issued the development letter referred to in finding 52, that General Grice learned of plaintiff’s claim and the fact that the claim had been submitted to the GAO with the recommendation of Colonel Watson, the contracting officer. Upon the receipt of this information, General Grice sent for the files and also talked with some of the personnel in his office regarding the matter. After considering the matter for approximately one hour, he concluded that Colonel Watson of his office had made a serious mistake in recommending the approval of plaintiff’s claim. General Grice then convened a series of meetings in his office. One of these conferences, which was reported and transcribed, was held on December 10, 1948, and was attended by General Grice and other personnel in his office, as well as by Mr. Kamen and his attorneys.[4] A number of questions were directed to and answered by Mr. Kamen regarding his conversations with Mr. Macintosh prior to the submission of plaintiff’s bid, plaintiff’s inventory of tallow, plaintiff’s acquisition and sale of tallow, plaintiff’s other contracts and the amount of tallow required for them, plaintiff’s efforts to obtain vendor’s shipping documents, etc.
At the time General Grice began his investigation of plaintiff’s claim, Colonel Watson was en route to a permanent station in Japan. General Grice ordered that Colonel Watson be recalled to the New York office, where his written statement, given in response to questions propounded in General *680 Grice’s office by the chief of the legal section, was taken and transcribed for submission to the Quartermaster General.
Colonel Kuhn, who had served as contracting officer for plaintiff’s contract from May 1947 to December 1947, was also recalled by General Grice, and a written statement regarding his knowledge of plaintiff’s claim was also taken down and transcribed. Included in the statement from Colonel Kuhn (in evidence as defendant’s exhibit 85) was the following question and answer:
Grice. Then had a request been brought to your attention that the contractor be allowed to produce and ¿lip by the end of August, do you think it would have been permitted, or not permitted?
KuhN. I feel sure that it would not have been permitted because normally the delivery schedule is based on depot needs and the storage situation.
An attorney in the legal section of the New York office, who had no prior connection with the claim, was detailed by General Grice to assist in an investigation, and auditors were assigned to make an investigation of and a report on the accounting data submitted by the plaintiff. Statements were taken from the inspector; information was obtained regarding the availability of storage space at the time plaintiff’s contract was entered into, and an investigation was made as to the availability of export packing containers in plaintiff’s plant for the export portion of the contract.
55. Colonel Watson was instructed by General Grice to restudy the case, evaluate all significant factors, and to make a report of his conclusions and recommendations. On December 24, 1948, within about 10 days after he had been recalled to the New York office, Colonel Watson, the successor contracting officer, submitted his supplemental report and recommendations on plaintiff’s claim. The report, which is in evidence as defendant’s exhibit 84, was a complete reversal and repudiation of his original report of September 2, 1948 (finding 51). The report stated that no requests for Vendor’s Shipping Documents had been made of Colonel Kuhn, the contracting officer during the period involved; that Colonel Kuhn had not delegated his authority to any other person and that if plaintiff’s request for such *681 shipping documents was made to Mr. Macintosh, neither Mr. Macintosh nor any other employee had the authority to reject the requests or to make any administrative decision other than in accordance with the terms of the contract, and that in view of Mr. Macintosh’s lack of authority, there was no breach of contract on the part of the Government.
The report also stated that the contractor had made no protest in writing because of the Government’s refusal to supply shipping documents until plaintiff submitted its claim of December 8,1947, and that no verbal protest in this regard was made to the contracting officer until late in September, after the sharp rise in the market price of tallow; that there was a considerable volume of correspondence and other data, showing that the contractor preferred to delay delivery in the hope that the falling tallow market would continue; that the contractor could not have made immediate delivery of the soap even though the Vendor’s Shipping Documents had been received; that plaintiff did not have the necessary packaging materials to comply with the export provisions of the contract and that plaintiff’s contention that its losses were due to the Government’s failure to supply shipping documents was an afterthought. The report closed with a request that the Comptroller General reconsider his decision of November 17,1948, and the recommendation that the plaintiff’s claim be denied in its entirety.
Colonel Watson was not called as a witness and the record does not disclose what evidence, other than the Macintosh memorandum of July 23, 1948, he had before him when he made the report of September 2, 1948, or the subsequent report of December 24,1948.
56. The report of the contracting officer, together with the statement and recommendation of General Grice, and the endorsement of the Quartermaster General were forwarded to the General Accounting Office on January 13,1949. The Army also submitted to the GAO other data which had been procured in the course of the investigation, including the transcript of the statements given by Mr. Kamen and others at the conference held in General Grice’s office; an affidavit of the inspector who serviced the contract, and the report of the attorney who assisted in the investigation.
*682 The record does not show that General Grice, in the course of his investigation, took any statement from Mr. Macintosh, or that any statement from Mr. Macintosh was transmitted with the report that went to the GAO on January 13,1949.
57. The Army sent several auditors to plaintiff’s office in New York, where their investigation extended over a period of more than six months. Mr. Kamen made plaintiff’s files freely available to them and also suggested that they examine plaintiff’s files in Barberton, Ohio. The audit was not completed until a short time prior to June 7, 1949, when the complete report of the audit was submitted by the office of the Quartermaster General to the General Accounting Office. With the audit, there was submitted a determination made by the contracting officer who succeeded Colonel Watson to the effect that plaintiff was not entitled to recover anything on its claim.
58. On July 12,1949, the General Accounting Office issued a settlement certificate denying plaintiff’s claim. The decision was, to a large extent, based on the report made by the Quartermaster General and denied the claim on the grounds: (a) that plaintiff’s letters of September 30, October 31, and November 7, 1947, demonstrated that plaintiff did not have sufficient tallow on hand to manufacture the soap covered by the contract and understood that it was not bound to complete deliveries prior to the dates scheduled in the contract; (b) that the Quartermaster Corps had ample storage space available by July 1, 1947, and that Mr. Macintosh had no authority to refuse plaintiff’s request for shipping instructions; (c) that the tallow which plaintiff had on hand was used for filling other orders, including a contract with the Veterans’ Administration; (d) that plaintiff did not consider that the contract required it to deliver all the soap prior to August 15, 1947, because plaintiff’s order for shipping bags provided for the bags to be delivered on August 15, 1947; (e) that plaintiff sold substantial quantities of tallow at a profit during the months of September, October, and November 1947, although plaintiff had contended that it could not obtain sufficient tallow to perform the contract during the same period, and (f) that the Government’s ac *683 tion allocating fats and oils for export did not afford plaintiff any right to relief.
On August 18, 1949, plaintiff’s attorneys acknowledged receipt of the settlement certificate and submitted additional documentary material in connection with a request for reconsideration of the order of disallowance. Plaintiff’s attorneys requested that no final action be taken until Mr. Kamen and his counsel were afforded an opportunity to confer personally with representatives of the General Accounting Office.
Plaintiff’s request for reconsideration was assigned to Stephen P. Haycock, an attorney in the General Accounting Office, who was charged with the duty of reviewing the evidence and preparing a decision for the signature of the Comptroller General. Thereafter, during the succeeding two months, Mr. Kamen and his attorneys held a number of conferences with Mr. Haycock and with other personnel in the General Accounting Office for the purpose of obtaining favorable action on plaintiff’s claim. During the conferences, Mr. Haycock made it clear to both Mr. Kamen and his attorneys that the General Accounting Office was particularly interested in obtaining additional data and evidence relating to plaintiff’s intention and ability to accelerate deliveries of soap under the contract.
As part of the effort to secure a reversal of the General Accounting Office decision of July 12, 1949, Mr. Kamen’s affidavit of September 13, 1949, was submitted to Mr. Haycock on the same date the instrument was signed.
Included in the affidavit, which covered many phases of this controversy, was a detailed statement by Mr. Kamen to the effect that he intended, and that he so advised Mr. Macintosh at and after the date plaintiff received the invitation to bid, to begin the manufacture and shipment of the soap immediately after the contract was awarded and to complete all deliveries by the end of August 1947. No reference was made in the affidavit to the submission by plaintiff of a covering letter as a part of its bid of May 19,1947.
Mr. Haycock discussed many of the statements in the affidavit with Mr. Kamen in connection with other evidence available in the General Accounting Office. Mr. Haycock *684 then forwarded the affidavit to Mr. Macintosh with the request for his affidavit in reply to the matters set forth in Mr. Kamen’s affidavit. Pursuant to the request, Mr. Macintosh submitted an affidavit of September 28, 1949. His affidavit contained statements in denial of many of the assertions in Mr. Kamen’s affidavit. Among other things, it was stated in Mr. Macintosh’s affidavit that while plaintiff had requested YSD’s prior to August 1,1947, such requests appeared to be routine and were made without any indication that the contractor intended to accelerate deliveries of soap; that at no time during May, June, July, August or September 1947 did any representative of plaintiff discuss acceleration with him or state that plaintiff intended to accelerate deliveries, and that prior to October 1947, he had no reason to believe that plaintiff intended to accelerate deliveries.
In his affidavit, Mr. Macintosh made no reference to his memorandum of July 23,1948, which is quoted in finding 51. However, a copy of that memorandum had been sent to the General Accounting Office on September 30,1948.
In the memorandum of July 23,1948, Mr. Macintosh had stated that in June or July 1947, he was informed by the office of the Quartermaster General that it could not authorize acceleration of deliveries because of lack of storage space, and that he then told plaintiff’s representatives that plaintiff would have to comply with the shipping schedule set out in the contract. These statements in the memorandum were not mentioned in his affidavit.
59. During a conference with one of plaintiff’s attorneys on September 15, 1949, Mr. Haycock advised the attorney that the evidence available in the General Accounting Office did not indicate that plaintiff intended to accelerate delivery of soap under the contract, stating that the evidence prior to plaintiff’s letter of December 8, 1947, indicated the contrary. At the same time, Mr. Haycock advised plaintiff’s attorneys that if Mr. Kamen had any documents which indicated plaintiff’s intent to accelerate deliveries, such documents should be produced without delay.
On the following Tuesday, September 22,1949, Mr. Kamen telephoned Mr. Haycock, stating that plaintiff’s attorney had acquainted Mr. Kamen with Mr. Haycock’s comments at the *685 conference of September 15,1949. In the same conversation, Mr. Kamen related that, as a result of the call from plaintiff’s attorneys, he had searched his files and found certain interoffice memoranda and teletype messages, which passed between plaintiff’s New York office and its Barberton plant. Mr. Kamen read one of the memoranda and inquired whether that was the type of evidence Haycock had in mind and was told that it was.
By a letter of September 22, 1949, Mr. Kamen wrote his attorneys and enclosed photostatic copies of several teletype messages to and from his Barberton plant and also four photostatic copies of interoffice memoranda between plaintiff’s New York office and the Barberton plant. The letter transmitting these documents to plaintiff’s attorneys read in part as follows:
With further reference to our telephone conversation regarding our claim, we have gone through our files on correspondence and am enclosing herewith photostatic copies of the following:
Teletypes to and from the plant.
Our letter to our plant dated May 13,1947.
Our letter to our plant dated May 22,1947.
Our letter to our plant dated June 6,1947.
Letter from the plant to us dated June 10,1947.
These letters certainly indicate our intentions in connection with the manufacture of the contract in accordance with the Acceleration Clause. Not being a lawyer, of course, I cannot appreciate these letters, but since you explained that it is now important that we prove that not only did we ask for the VSDs, but also that we intended to manufacture immediately upon receipt of the contract. I do not believe, however, that it is necessary to further prove that requests were made for VSDs in view of the fact that the Army has already admitted this.
With regard to the comments of the Army Auditor that our maximum production never exceeded 200,000 lbs. per month, I am enclosing herewith a record from our production sheets going back to October 1946. You will please note that the lowest ever produced was 700,-000 lbs., and that was in June 1947, where we were awaiting VSDs for this contract. Had the VSDs been here we would have produced at least 600,000 lbs. additional *686 during those months. We are not surprised, however, at his comment on production as it bears out the same reasons for distorting the facts on the availability of tallow and bags.
On September 23, 1949, these documents were sent by plaintiff’s attorney to the General Accounting Office for the purpose of overcoming the objections raised to plaintiff’s claim.
60. By letter of October 1, 1949, plaintiff’s attorneys transmitted to Mr. Haycock in support of plaintiff’s claim additional documentary material, including three additional interoffice memoranda between plaintiff’s New York office and its Barberton plant. The memoranda were dated June 12, 1947, July 11, 1947, and July 16, 1947. The three mem-oranda submitted on October 1, 1949, were on tissue and each was marked “Copy.”
Defendant’s plea of fraud is directed to the seven interoffice memoranda above referred to, and these are hereinafter set out in full.
61. On November 3, 1949,. the Comptroller General issued Ms decision on plaintiff’s request for reconsideration. The settlement of August 12, 1949, in wliich the claim had been disallowed, was sustained. The letter setting forth the decision was prepared by Mr. Haycock and signed by the Comptroller General. The decision, which is in evidence as defendant’s exhibit 25, summarized plaintiff’s claims in connection with the evidence that was made available to the General Accounting Office and stated that such evidence did not support either (1) plaintiff’s contention that it intended to make deliveries of soap at the rate of 800,000 pounds a month, beginning the first of June 1947, and to complete the contract before the middle of August 1947, or (2) its assertion that it had the ability to accelerate deliveries as represented.
62. Approximately a week after the issuance of the Comptroller General’s decision of November 3, 1949, Mr. Kamen and one of his attorneys again conferred with Mr. Haycock in the General Accounting Office. At that time, Mr. Kamen challenged a statement in the Comptroller General’s decision to the effect that plaintiff was delinquent in deliveries of *687 soap even after shipping documents had been furnished. Mr. Kamen asserted that he could establish the inaccuracy of the statement by the bills of lading.
On the same afternoon after the conference had been concluded, Mr. Kamen telephoned to plaintiff’s office in Bar-berton and spoke to Mrs. Vesta McCanna, an employee there. He instructed Mrs. McCanna to make a thorough search for the bills of lading, stating that he needed them badly. Prior to that time, Mr. Kamen had requested the office in Barberton to send all papers pertaining to the Quartermaster contract to plaintiff’s New York office, but in the telephone conversation he insisted that he did not have the bills of lading in New York. Mrs. McCanna knew that the documents pertaining to the contract presumably had been shipped to New York, and for that reason she searched places where ordinarily she would not have expected to find the papers requested. On the afternoon of the same day, Mrs. McCanna found a carton of documents, including the yellow copies of the bills of lading that had been described by Mr. Kamen, in a dead storage room on the third floor of the plant in Barberton. In addition to the bills of lading, the carton contained a copy of plaintiff’s bid and a carbon copy of a letter dated May 19,1947.
On the following morning, when Mr. Kamen telephoned the Barberton office, Mrs. McCanna told him exactly what she had found and read to him the letter that was attached to the copy of the bid. The contents of the letter have been quoted in finding 14.
Mr. Kamen had not instructed Mrs. McCanna to search for a copy of the bid or to look for such a letter.
63. Upon learning about the contents of the carton found by Mrs. McCanna, Mr. Kamen instructed her to mail all the papers to him in New York at once. The shipment was promptly made in the same box in which the papers had been found.
About November 18, 1949, after he had received and examined the contents of the carton found by Mrs. McCanna, Mr. Kamen telephoned Mr. Haycock in Washington stating that he had found the bills of lading. He also read the letter to Mr. Haycock, who suggested that these documents *688 be mailed to tlie General Accounting Office. Mr. Haycock advised Mr. Kamen to make copies of any documents submitted, since the General Accounting Office did not ordinarily return papers filed with it. Plaintiff’s attorneys were told about the letter and they directed Mr. Kamen to have additional copies of it made.
64. By letter of November 26, 1949, plaintiff’s attorneys requested the Comptroller General to reconsider the decision of November 3,1949, primarily on the basis of the letter of May 19,1947. In that connection the letter from plaintiff’s attorneys read in part as follows:
For the sake of clarity, this letter will be addressed to each of the points in your opinion in the order in which they are raised:
The Contractor's intention to rely upon the acceleration clause of the contract. Your opinion states that although Kamen Soap Products Company, Inc. (hereinafter called “Kamen”) contends that it intended to rely upon the acceleration clause and make delivery promptly after the award of the contract, that its bid did not indicate such intention. Your opinion further states:
If you had indicated in your bid a definite delivery schedule different from that contained in the invitation, as, for example, that you would complete deliveries immediately after execution of the contract, and the Government accepted such a bid, the Government would then have been bound to issue shipping instructions or accept deliveries immediately after award.
Your opinion thereupon proceeds to describe various elusive circumstances which allegedly indicate that Kamen did not intend to make accelerated delivery.
These allegations are met squarely and destroyed by attached documentary evidence which proves conclusively the inaccuracy of such contentions. Attached hereto as Exhibit A is a copy of a letter from Kamen to the New York Quartermaster Purchasing Office, dated May 19, 1947. This letter has either been lost or suppressed by the New York Office because we think it would have been impossible to have written your opinion as above quoted. The letter, which was the covering letter to the bid, demonstrates beyond doubt that Kamen’s bid was submitted in reliance upon the ac *689 celeration clause and that it was Kamen’s intention to deliver against the subject contract immediately upon award. The import of this letter is so great that it deserves quotation in full:
*****
It is submitted that the original of this letter is or should be in the files of the New York Quartermaster Purchasing Office. If it is in the files of that office and has not been submitted to the General Accounting Office, then the only logical interpretation is that the letter has been consciously and deliberately suppressed in an effort by the New York Quartermaster Office to save face. Otherwise, it is incredible how the General Accounting Office could have reached the decision which it did in its opinion of November 3,1949.
It is also quite clear that the statement contained in the first paragraph of your opinion of November 3, 1949, must fall since rather than allowing until July 18, 1947 for the Government’s acceptance of the bid, the aforementioned _ letter proves that Kamen requested acceptance within three (3) days and, as an alternative, agreed that unless a formal contract could be executed within ten (10) days, a letter of advice informing Kamen that the bid was accepted within ten (10) days would be acceptable. The record shows that the latter proposal was adopted by the Government. (See Exhibit 2 to affidavit attached.) To demonstrate that the acceptance of this bid was made under unusual circumstances indicating Kamen’s need to make prompt accelerated delivery, it should be noted that never before or since the acceptance of this hid has the Army accepted a bid from Kamen prior to the time allowed for acceptance. Never has the Army notified Kamen of an award by letter. This letter was dated within ten days of Kamen’s letter of May 19,1947, indicating that it was in response to his request for prompt acceptance contained in the letter of May 19, 1947. It negatives your contention that Kamen allowed the Army until July 18,1947, to accept.
With the request for reconsideration, plaintiff’s attorney submitted two copies of the letter of May 19, 1947. One of these was a ribbon copy marked “Copy” in the upper left-hand corner; the other was a photostat. Each of the copies bore the initials “ALK: MEW”. The initials “MRW” referred to Miriam R. Weissman, Mr. Kamen’s secretary, *690 whose affidavit accompanied the copies. The affidavit recited that the letter of May 19, 1947, a copy of which was attached to her affidavit, had been dictated to her by Mr. Kamen, signed by him on the same day and personally submitted by Mr. Kamen with plaintiff’s bid.
No express statement or representation was made by Mr. Kamen or his attorneys that the photostatic copy submitted with the request for reconsideration was a photostatic copy of the letter located by Mrs. McCanna.
65. By letter of December 2, 1949, plaintiff’s attorneys submitted to the Comptroller General an affidavit signed by Mrs. Yesta McCanna, to which was attached a carbon copy of the letter of May 19,1947, which letter was marked “Copy” in the upper left-hand corner. The affidavit stated that she received a telephone call from Mr. Kamen about November 14,1949; that he had instructed her to look for certain papers and that during the search she had found a copy of the bid and a copy of the letter dated May 19,1947.
66. Plaintiff’s claims that it had sought to accelerate deliveries of soap under the contract and that this fact was established by the covering letter of May 19, 1947, were brought to the attention of officials in the Department of the Army, including a representative of the Judge Advocate General’s office, the Special Assistant to the Assistant Secretary of War, and the Assistant Secretary of War. Plaintiff’s claims were discussed in conferences attended by plaintiff and his attorneys and were reiterated in correspondence.
In a letter of November 28,1949, to the Assistant Secretary of War, plaintiff’s attorneys requested him to reexamine the case and stated that the NYPO had distorted the facts; had failed to produce or had lost the letter of May 19,1947, and had otherwise undertaken to frustrate the obligation of the Government to the contractor.
67. By letter of December 1,1949, the General Accounting Office advised the Quartermaster General that plaintiff’s attorneys had requested reconsideration of the action denying plaintiff’s claim and had submitted additional evidence, including a photostatic copy of the letter of May 19, 1947, which plaintiff claimed had been transmitted with its bid. A copy of the letter of May 19,1947, was enclosed with the *691 letter, and a request was made that the files of the NYPO be searched in an effort to locate the original of the letter. The letter from the General Accounting Office also summarized the several contentions which had been made by plaintiff’s counsel in the letter of November 26, 1949, and requested that the Quartermaster General submit a full report as to the facts regarding each of these matters.
88. When the request made by the General Accounting Office reached the NYPO, Harry D. Shargel, an attorney in the legal section, was directed to make a search for the original of the letter of May 19,1947. He examined all the files in the office pertinent to the contract and interviewed all the NYPO personnel, whom he believed would have had an occasion or opportunity to see the letter. His search failed to produce any information regarding the letter.
Mr. Shargel did not interview the bid officer, Colonel Kuhn, or Colonel Watson in December 1949, when he looked for the letter, because they were not in the New York office then. However, in December 1948, when he was assigned by General Grice to investigate plaintiff’s claim, Mr. Shargel had interviewed both Colonel Kuhn and Colonel Watson. Until the General Accounting Office letter of December 1, 1949, was handed to him, Mr. Shargel had never received any information regarding the existence of the letter, which plaintiff claims was submitted with its bid.
On December 14, 1949, the Department of the Army submitted to the General Accounting Office a detailed statement as to the results of the search for the letter of May 19, 1947, and a report of its investigation of the several matters inquired about by the General Accounting Office. The report, which is in evidence as defendant’s exhibit 91, had attached thereto a number of affidavits and other documents and advised the General Accounting Office that no trace of the letter had been found.
69. On February 13, 1950, the Comptroller General issued his decision, denying plaintiff’s request for reconsideration. The decision, which is in evidence as defendant’s exhibit 30, stated among other things that the General Accounting Office had made inquiry of the administrative office concerned in an attempt to obtain the original of the letter dated May *692 19, 1947, and that it had been advised that the letter could not be found after an exhaustive search had been made.
Thereafter, on March 13, 1950, plaintiff filed its petition herein to recover the sum of $1,800,000 for damages claimed to be due as a result of breaches of the contract by the defendant. Among other things, plaintiff alleged in its petition that it had transmitted with its bid of May 19, 1947, a covering letter, which required that the bid be accepted, if at all, within 10 days. The contents of the letter of May 19, 1947, were quoted in plaintiff’s petition.
After plaintiff’s petition was filed in the Court of Claims, conf essences were held by Department of Justice representatives (who appeared as counsel of record for the defendant in this case in the Court of Claims) with representatives of plaintiff and its counsel. These conferences were held for the purpose of discussing the possibility of a compromise settlement of this case. In support of its claims and contentions, and in an effort to procure a favorable recommendation for a compromise settlement of this case by Government counsel, plaintiff, among other matters, specifically referred to and relied upon the letter of May 19,1947, and the seven interofiice memoranda which are detailed in the defendant’s plea of fraud.
70. In preparation for the Government’s defense, the Federal Bureau of Investigation was requested to make a complete investigation and audit, including particularly all facts relating to the letter of May 19, 1947, and the seven interoffice memoranda, copies of which had been submitted by plaintiff to the General Accounting Office on September 23, 1949 and October 1, 1949 (findings 59 and 60). The investigation was conducted primarily by Special Agents George Simpson and Thomas Hurley, but at times they were assisted by other agents. A considerable portion of the investigation was conducted in plaintiff’s office and during the course thereof Mr. Kamen and plaintiff’s employees cooperated with the agents and allowed them free access to plaintiff’s files and records.
Agents Simpson and Hurley first called on Mr. Kamen at the latter’s office in New York City on June 22, 1950, and among the records which Mr. Kamen made available for their *693 examination at that time was a file marked “A May 19, 1947, Cover Letter.” This file contained a ribbon copy, two carbon copies, and one photostatic copy of the May 19, 1947 letter. The agents took the four papers to their office and compared them with the copies of the letter that had been furnished by the Quartermaster Corps and the General Accounting Office. After photographing the letters, they identified them by placing their initials thereon and returning the file to Mr. Kamen.
Subsequently, it was established that all four copies of the letter in the file were from the same typing run; i. e., the two carbons were carbon copies of the ribbon copy in the folder and the photostat was made from another carbon copy of the ribbon copy.
After noting that there were apparently a number of copies of the May 19,1947 letter, the agents on June 26,1950, asked Mr. Kamen to supply the carbon copy of the original letter which plaintiff claimed had been written and submitted to the New York Quartermaster office on May 19, 1947. Mr. Kamen searched his records and produced the folder which the agents had returned to him on June 23,1950, three days before. At that time, the folder contained only the photostat of the letter, the ribbon typing and the two carbons having been removed. The agents stated that they wanted the carbon copy typed in 1947 rather than a photostatic copy thereof. However, when Mr. Kamen was unable to find the carbon copy in his files, he delivered the photostatic copy of the letter to the agents and at their request signed the following statement appearing on the reverse side thereof:

New Y orle, Oity, 6/26/SO.

I believe this is a photostat of the 5/19/47 carbon covering letter found by Vesta McKenna, bookkeeper of Kamen Soap Products Co. Inc. at Barberton Ohio about Nov. 14, 1949. The original of this carbon was personally delivered by me to the Army Quatermaster [sic] representatives, NYC on May 19, 1947 in connection with the opening of the bid.
(Signed) A. L. Kamen.
Witnessed:
G. P. Simpson,
Special Agent, FBI, N.Y.G.
*694 The words “I believe” at the beginning of the statement were added at Mr. Kamen’s request before he would sign the statement.
On the same date, the agents requested Mr. Kamen to produce the seven interoffice memoranda which plaintiff claimed had been prepared in 1947 and had been written to and from its Barberton plant and New York office. These were the memoranda, of which copies had been supplied to the General Accounting Office as stated in findings 59 and 60. The agents made it clear to Mr. Kamen that they wanted the actual memoranda, which according to Mr. Kamen had been prepared and sent in 1947.
71. On July 10,1950, while the agents were in Mr. Kamen’s office, he delivered to them a carbon copy of the letter of May 19, 1947. It was one of the two carbon copies they had observed in the folder which was included in the records made available to them by Mr. Kamen on June 22, 1950. The agents told Mr. Kamen that they desired to deal only with original evidence and pointed out that they had previously seen a ribbon typing, two carbon copies and one photostatic copy of the letter in the folder handed them by Mr. Kamen. When the agents asked Mr. Kamen if he was certain that the letter tendered by him was the true carbon copy prepared in 1947, Mr. Kamen replied that he thought the document was the true carbon copy but that he could not be positive. The agents accepted the letter with the understanding that Mr. Kamen would notify them if he later found a document which he decided was the true carbon prepared in 1947.
On July 10, 1950, Mr. Kamen also delivered to Agents Simpson and Hurley seven interoffice memoranda, with the statement that the documents were being supplied in accordance with the request the agents had previously made on June 26, 1950. The documents consisted of a carbon copy of a memorandum dated July 11, 1947, from the Bar-berton office to the New York office and six ribbon copies on interoffice memorandum forms. Five of the latter were from New York to Barberton and were dated respectively May 22, 1947, June 6, 1947, May 13, 1947, June 12, 1947, and July 16, 1947. One was from Barberton to New York and was dated June 10,1947.
*695 The agents learned that the procedure in plaintiff’s office in the transmission of interoffice memoranda was to send the original memorandum, written on the printed memorandum form, to the office receiving the message and to retain a carbon copy of the document in the office which sent the message. Although this procedure was followed in general, examination revealed that on some occasions the carbon was sent to the receiving office and the original retained in the office from which the message was sent. Therefore, when the seven interoffice memoranda were furnished, the agents requested Mr. Kamen to obtain and deliver to them the other half of each of such seven interoffice memoranda, i. e., if they had been furnished the original of a memorandum prepared in 1947, they wanted the carbon copy thereof and if Mr. Kamen had already supplied the carbon, they wanted the original. Mr. Kamen stated that such documents were in Barberton, Ohio, but that he would obtain them. On September 25,1950, after a shipment of records from Barberton had been received in New York by Mr. Kamen, he furnished Agent Hurley seven interoffice memoranda. These consisted of a ribbon copy on the printed form of a memorandum to New York from Barberton dated July 11, 1947, carbon copies of five memoranda from New York to Barberton dated May 22, 1947, June 6, 1947, May 13, 1947, June 12, 1947, and July 16, 1947, and one carbon copy of a memorandum from Barberton to New York dated June 10, 1947. At the time the documents were delivered, Mr. Kamen told Agent Hurley that they were the opposite numbers of the seven memoranda which had been supplied on July 10,1950.
72. On August 29,1950, after receiving a message that Mr. Kamen desired to see him on an important matter, Agent Simpson called at Mr. Kamen’s office and was told by Mr. Kamen that, while he was reviewing a legal file at his home, he had found an additional copy of the May 19, 1947, letter. Mr. Kamen also stated that he had concluded that this document was the true carbon copy of the letter because it was attached to another letter that had been mailed to him by his attorneys. Part of the sheet on which the letter appeared (defendant’s exhibit 61) had been tom off at the top and bottom. Mr. Kamen explained that the letter was in a torn *696 condition when he received it from the Barberton office and that it had been further torn by subsequent handling. He offered to furnish a letter stating the facts regarding the torn document, and on September 1, 1950, he wrote Agent Simpson as follows:
You requested that I explain in detail the conditions and the veracity of the letter dated May 19, 1950 which accompanied the bid to the Quartermaster.
To the best of my knowledge, this letter, which I initialed on August 20,1950 is the duplicate carbon copy which original, was submitted and delivered by me personally at the time of the bid opening to the Quartermaster New York City.
This carbon copy appears to have been sent by our N. Y. office to our factory together with either our copy of the bid or the contract which we received from the Quartermaster. This letter was filed away by our Bar-berton office staff after the completion of the contract in Aug. 1948, and kept there until our office girl, Miss Vesta McCanna was requested to send to our N. Y. office copies of VSDs and bills of lading used in connection with this contract. When she located the package of documents referred to above, she located the contract, bid, this letter as well as the bills of lading and VSDs. She sent the entire package to our N. Y. office and submitted an affidavit of the finding of this letter to that effect.
When this letter was received at our N. Y. office it was torn on the top and bottom and creased, but not quite as much as it is at the present time.
When I showed this copy of the letter to Mr. Beed Miller, our Washington attorney, it was partially torn as described above, and he cautioned me to be very careful not to lose this letter. Mr. Miller also advised me to make several copies of this letter and photostats to be used in connection with our claim. We filed this letter together with Mr. Millers letter and Vesta Mc-Canna’s affadavit [sic] as fell as a copy of the Quartermaster letter to us dated May 28, 1947 in our legal file and not in the Quartermaster file.
After showing this letter to our attorneys in Washington they gave it back to me in person or through the mail and it appeared to be in the same torn and creased condition as it was at the time we received it for our Barberton office. Being careful to keep this letter under strict surveillance we filed it in our legal documents file.
*697 When your Mr. Hurley requested the original carbon copy of the letter referred to above, we at first gave him what we thought was the original but now proves to be one of the copies. However, after referring to our legal file we located this letter fully stapled to the other letters.
In teraring [sic] this letter from the other letters attached thereto it was torn in the upper left hand corner because of the many staples holding it together. I cannot recall the exact circumstances how the top and bottom of this letter was further tom except through the excessive handling of many people.
It should be noted that this sheet was handled all through the entire period where shipments were being made from May 1947 to Aug. 1948 as it was attached to the contract. We also note that the contract itself was torn in numerous places from the tremendous amount of handling it has received.
On November 8, 1950, Mr. Kamen delivered to the agents the ribbon copy and one of the carbon copies of the letter of May 19, 1947, which they had observed in plaintiff’s file on June 22,1947. The agents had requested these two documents in order to make certain that they had received all known ribbon copies and carbon copies of the cover letter in Mr. Kamen’s possession.
73. The five copies of the letter of May 19, 1947, and the originals and carbon copies of the seven interoffice memo-randa, which were supplied to the agents by Mr. Kamen, were the only copies of such documents exhibited by Mr. Kamen or delivered to the agents during the investigation. No other copies of such documents were found by the agents during their investigation. All these documents were submitted to the laboratory of the Federal Bureau of Investigation in Washington, D. C.
74. As a part of their investigation, the Special Agents of the Federal Bureau of Investigation examined plaintiff’s books and records and those of his suppliers to ascertain when and from whom plaintiff had purchased onionskin paper which had been used to make carbon copies of letters and interoffice memoranda during the period from 1946 through February 1950.
In order to enable the FBI laboratory to examine the documents submitted, the agents also took typing samples *698 made on all the typewriters in plaintiff’s New York office, with the exception of one typewriter which was not in operating condition and had not been used for several years. These samples were taken in accordance with the directions specified by the laboratory for use in its analysis. Before the samples were taken, it was ascertained that there had been no sale or exchange of typewriters in the New York office and no interchange of typewriters between the New York office and the Barberton office during the period between May 1,1947 and June 1950.
The agents also took from plaintiff’s general correspondence files samples of carbon copies of letters, of original interoffice memoranda and carbon copies of such memo-randa. A random selection was made from letters and mem-oranda which had been prepared during the period between May 1947 and January 1950. Samples were also taken of blank printed forms of interoffice memoranda found in plaintiff’s supply cabinet. The agents sent such samples and blank forms to the laboratory.
75. After reports of the investigation and laboratory analysis had been made, the Department of Justice decided that a plea of fraud should be filed on behalf of defendant in this case, but before it was filed plaintiff’s then attorney of record was informed that the Government had determined that the letter of May 19, 1947, and the seven interoffice memoranda had not been prepared on the dates claimed by plaintiff and that the Government intended to file a plea of fraud. At the same time, plaintiff’s attorney was told that the Department of Justice would consider any further information or explanation which plaintiff’s attorney desired to submit.
Thereafter, plaintiff’s attorney advised Government counsel that Mr. Kamen had been notified of defendant’s intention to file the plea of fraud and that as a result, Mr. Kamen had delivered to his attorney a carbon copy of the May 19, 1947, letter, which Mr. Kamen believed was the true or original carbon copy of that document. Government counsel requested that the letter be submitted to the F. B. I. laboratory for examination, but plaintiff’s attorney stated that *699 lie preferred to have the document examined by experts selected by him. He further stated that when the experts made a report, he would advise Government counsel and deliver the carbon copy of the letter to the Government for examination. On August 2, 1951, plaintiff’s attorney, accompanied by Mr. Kamen, submitted to Government counsel the copy of the letter of May 19, 1947, which had been delivered to the attorney by Mr.' Kamen and identified by him, to the extent stated above, as being the true or original copy of the May 19, 1947 letter. At the same time, a copy of the report of the expert retained by plaintiff was given to Government counsel.
The carbon copy of the letter was sent to the FBI laboratory where an examination disclosed that it was a carbon copy of the ribbon copy which the FBI agents observed in plaintiff’s files on June 22, 1950; that it was a part of the same typing run as the two carbon copies that they saw in the file on the same date; that this copy of the letter had been used to make the photostat, which was submitted to the GAO on November 26, 1949, the occasion when plaintiff first advised the GAO of the existence of such a letter; that this copy was also used to make the photostatic copy thereof which was delivered to the FBI agents by Mr. Kamen on June 26, 1950, and that this copy of the letter had not in fact been prepared in 1947 as claimed by plaintiff but had actually been prepared some time after that date. After receiving this information, defendant filed its plea of fraud in this Court.
76. Defendant’s exhibit 44 is the ribbon copy of the letter of May 19,1947, which Agents Simpson and Hurley observed in the folder that was included in the records made available to them by Mr. Kamen on June 22, 1950. Defendant’s exhibits 45 and 46 are the two carbon copies of the letter which the agents observed in the folder on the same date and which were later delivered to them by Mr. Kamen on July 10 and November 8, 1950. Defendant’s exhibit 43 is a photostatic copy of the letter which the agents saw in the folder on June 22, 1950, and which was delivered to them by Mr. Kamen on June 26, 1950. Defendant’s ex:- *700 Mbit 1 is the carbon copy of the letter which was presented to Government counsel on August 2,1951, by Mr. Kamen and his attorney.
The uncontradicted evidence shows that the three carbon copies, defendant’s exhibits 45, 46, and 1, were all part of the same typing run and were made from the ribbon copy, defendant’s exhibit 44; that the three carbon copies were made on Flywate onionskin which was neither purchased nor used by plaintiff prior to August 1949; that the ribbon copy, from which these carbon copies were made, was prepared on a typewriter in plaintiff’s New York office in 1949; and that the photostatic copy of the letter delivered to Agents Simpson and Hurley (defendant’s exhibit 48), as well as the photostatic copy which was submitted to the General Accounting Office on November 26, 1949, are both photostats of defendant’s exhibit 1.
77. Defendant’s exMbit 61 is the torn carbon copy of the letter of May 19, 1947, which Mr. Kamen delivered to the FBI agents on August 29, 1950. Mrs. McCanna did not identify defendant’s exhibit 61 as the copy of the letter which she had found attached to plaintiff’s bid in November 1949, but in his letter of September 1, 1950, to the FBI (finding 72), Mr. Kamen stated that defendant’s exMbit 61 appeared to be the copy of the letter found by Mrs. McCanna.
The letter is torn at the top and the bottom to the extent that only a fragment of the watermark remains. It is impossible to make positive identification of the watermark from this small remaining fragment.
A laboratory examination, including an enlarged photograph, shows that the typewriter key which typed the letter “t” in the word “Quartermaster” on the first page of the letter and the letter “t” on the second page thereof in the word “not” was damaged. A comparison of the damaged “t” with similar characteristics found in random samples of interoffice memoranda prepared in plaintiff’s New York office shows that the damaged “t” first appeared in such memo-randa on September 7, 1949. This indicates that defendant’s exMbit 61 was prepared after the middle of the year 1949. However, the expert who made this comparison was *701 able, in connection with his examination of other questioned documents, to point out numerous characteristics in the typing as a basis for his conclusions.
Although there is evidence that defendant’s exhibit 61 was not prepared until 1949, it has not been established by a clear and satisfactory preponderance of the evidence as to when this particular copy of the letter was prepared.
78. It has been shown by clear, convincing, and satisfactory proof that plaintiff did not submit the letter of May 19, 1947, with its bid to the NYPO.
With the exception of Colonel Watson, who did not testify, the defendant produced as witnesses the officers and employees of the NYPO who, in the normal course of their duties, should have seen the letter if it existed. These included the bid officer; the individual who was head of the abstract section in the New York office from December 1947 to April 19, 1949; the civilian in charge of mail and records in the NYPO at all times material to this action; a procurement clerk who was employed throughout the period involved herein at the NYPO and who handled work in connection with the contract, such as preparing notices of awards, requests for approval of awards, and correspondence ; Mr. Macintosh, and Colonel Kuhn, the first contracting officer. None of them had ever seen nor heard of such a letter prior to December 1949, when a copy of it was sent by the General Accounting Office to the Quartermaster Corps.
Late in November 1947, David O’Shiver, an attorney in the legal section, was consulted regarding plaintiff’s claim. Mr. O’Shiver sent for and examined all the files relating to the contract in the New York office, including the central correspondence file with copies of the bids and contract, all pertinent correspondence, the files of Mr. Macintosh, and the files of the inspection division. He prepared a report and recommendation favorable to the plaintiff, and this report was signed by Colonel Watson on September 2, 1948 (finding 51). During his examination of the files and his study of the case, Mr. O’Shiver did not encounter either the original or any copy of the letter of May 19, 1947, nor was any suggestion made to him that such a letter existed.
*702 As stated in finding 68, Harry D. Shargel, another attorney in the New York Quartermaster office, searched all the files relating to the contract in December 1948 and again in December 1949. He interviewed Colonel Kuhn and Colonel Watson in 1948, and in 1949 he interviewed all the employees on duty in the office who would have had an opportunity to see the letter in the normal course of their duties. Mr. Shargel did not find any copy of the letter in the files and until a copy was transmitted by the GAO, he had never received any information indicating that such a letter existed.
Plaintiff’s bid was signed by M. R. Weissman (Miss Miriam R. Weissman), vice president of the company, and was witnessed by Herbert Shapiro, the assistant secretary of plaintiff. Although Miss Weissman made an affidavit on November 17, 1949, reciting that the questioned letter had been dictated to her by Mr. Kamen, signed by him and submitted with the bid, she signed a written statement at the request of Special Agent Simpson on August 20,1951, to the effect that her affidavit was based on the fact that her initials were typed on the lower left-hand corner of a copy of the letter that was shown to her at the time, and that she could not recall whether she had typed the letter. When she appeared as a witness in this case, she testified that she could not recall whether or not the letter had been dictated by Mr. Kamen and typed by her.
Herbert Shapiro was employed by plaintiff from March of 1946 until May of 1949. His duties consisted of handling inventory controls, preparing correspondence with sales brokers, and assisting Mr. Kamen in some of the office work involved in the handling of Government bids and contracts. He testified that in 95 percent of the Government bids submitted by plaintiff, it was customary to indicate the time allowed by the contractor for acceptance of the bid by a statement on the face of the bid form itself, but that in a few instances on large contracts letters were used. He also testified that while he recalled the bid of May 19,1947, he could not recall any letter in connection with the bid; that in his work he had occasion to refer to the bid and that he was unable to recall having seen any copy of a letter attached to plaintiff’s copy of the bid. Mr. Shapiro also testified that *703 the first discussion he heard regarding the question as to whether or not a covering letter had been submitted with the bid occurred sometime while he was in plaintiff’s employ, but he could not remember any of the details.
Mr. Kamen testified that he dictated the letter to Miss Weissman the morning of May 19, 1947; that he checked the bid, signed the letter, and instructed Miss Weissman to seal the papers in an envelope; that he did not put the copies of the bid or the letter into the envelope, and that he did not know whether or not the letter was in the envelope, since it was sealed at the time he picked it up to deliver it to the New York Quartermaster office.
79. The interoffice memoranda which Mr. Kamen delivered to the FBI agents on July 10 and September 25, 1950, are in evidence as defendant’s exhibits 47 to 60, inclusive. Defendant’s exhibits 47, 48, 49, 50, 51, 52, and 54 are ribbon copies on printed interoffice memorandum forms, and exhibits 53, 55, 56, 57, 58, and 60 are carbon copies made from such ribbon copies. At the time these memoranda were delivered to the agents, Mr. Kamen represented that they were the originals and the carbon copies of the documents prepared and sent in 1947. During the conference of August 2, 1951, at the Department of Justice, which Mr. Kamen attended with his attorney, Mr. Kamen informed counsel for the Government that he had given the FBI both the originals and the carbon copies of the interoffice memoranda that had been made in 1947.
The undisputed evidence shows that the originals of the seven memoranda were prepared on a type of interoffice memorandum form which was first purchased by the plaintiff in May of 1949, and was first used in plaintiff’s New York office in 1949; that the printed interoffice memorandum forms used in plaintiff’s New York office and the Barberton plant in 1947 were of a different printing than the printing on the questioned memoranda, and that the carbon copies of the memoranda are on Flywate onionskin, a type of paper which was not purchased or used by plaintiff prior to 1949.
Two of the memoranda dated July 10 and July 11, 1947, were purportedly sent from Barberton, Ohio, to the plaintiff’s New York office in 1947, but the undisputed evidence *704 shows that these documents were written on forms which were not used at Barberton in 1947, and that they were in fact prepared on forms which were first purchased and used in the New York office in 1949, that the carbon copies of the two memoranda were prepared on a type of paper which was not purchased or used by plaintiff prior to August 1949, and that the memoranda were prepared on a typewriter in plaintiff’s New York office.
80. Plaintiff has not denied that defendant’s exhibits 47 to 60, inclusive, were prepared in 1949. In his testimony, Mr. Kamen denied that he had represented that the questioned documents were the true documents prepared in 1947 but said that if he made such representations, he meant only that the contents of the questioned memoranda are the same as those of the true documents.
In this action, plaintiff claims that the inherent plausibility of the memoranda is established by statements appearing in the memoranda when these are considered in connection with facts and circumstances in evidence.
81. The memorandum of May 13,1947, reads as follows:
InteRoeeice Memorandum Kamen Soap Products Co., Inc.
Date: May 13,191ft.
To: Barberton, Ohio
From: N. Y. Office Subject: Enclosure
This bid opens May 19th. Must have formula and costs at once.
The army will take delivery as fast as we can produce. I believe you said we can turn out about 800,000 lbs. per month per single shift in our tower. Will not buy tallow until award is definitely made to us.
For domestic packing, you can use stock bags or barrels. For export, order bags from Jaite Company, or barrels from local source.
Bags will have to be printed or stenciled in accordance with marking instructions which will be furnished with the contract.
Unless this contract is completed real fast there is a danger of a great loss with this crazy market on F & O.
ALK: bio
*705 As stated in finding 31, Mr. Kamen was in Barberton on May 18,1947, and during tbe morning of that day received á teletype from his New York office, stating that the invitation to bid on the Quartermaster contract had been received. The evidence does not disclose whether Mr. Kamen remained in Barberton throughout the day. There is evidence that on other occasions he was in both his New York office and his Barberton plant on the same day, the flight time between the two cities being approximately two hours.
Carl B. Johnson was employed as Vice President and Plant Manager at plaintiff’s Barberton plant from October 1945 until June 1949, when he left to take a position with Armour & Co. He testified that the interoffice memo-randa between Barberton and New York were generally handled by Mr. Smith, the office manager at Barberton, but that occasionally he dictated memoranda dealing with production problems. He could not recall the exact language used in the above-quoted memorandum, nor was he able to state that he had read the specific language therein. However, he did recall that within a few days after May 13,1947, he had seen a message from New York containing a statement that the plant could turn out 800,000 pounds per month, per single shift in the tower. He remembered the statement because of an error therein. The tower at Barberton had a capacity of 20,000 pounds per shift per day, or 400,000 pounds in 20 days instead of 800,000 pounds. He did not recall that he ever mentioned the error to anyone.
The memorandum quoted above advised Barberton that bags in stock or barrels could be used for the domestic pack on the contract but that Barberton should order export bags from the Jaite Company. The evidence shows that while the 35-pound bags, which plaintiff had in stock, met the requirements of the specifications for packing the domestic portion of the contract, that fact was not ascertained by Mr. Kamen until July 16,1947, more than 60 days after the date of the memorandum. The teletypes show that as late as July 3, 1947, Barberton was inquiring about both domestic and export bags. As stated in finding 34, the Barberton plant was not informed by the New York office that the 35-pound bags in stock could be used for the domestic pack *706 until August 6, 1947, when a teletype message to that effect was sent to Barberton.
On May 14, 1947, plaintiff’s New York office inquired by teletype of the Barberton plant whether Barberton had received the specifications forwarded to it on the Quartermaster contract bid due May 19, 1947.
82. The memorandum of May 22, 1947, reads as follows:
INTEROFFICE MEMORANDUM
Kamen Soap Products Co., Inc.
To: Barberton Date: 5/%%/lfl.
From: A. Kamen
Subject:
Enclosing herewith our bid which opened May 19th for the Quartermaster covering 2,190,000 lbs. of soap powder, high titer, together with specifications #27. It certainly looks as if we will get this contract within a few days. It is important you clear all decks for Big Production.
Also enclosing herewith Invitation #150-E covering our bids on chips, bars and powdered soap together with specifications.
Also encloing [sic] herewith letter from the Jaite Company.
ALK: BIO
On May 22, 1947, Mr. Kamen knew that plaintiff was the highest bidder by a substantial amount because he had attended the bid opening.
Carl B. Johnson, whose position in the company has been described in the preceding finding, testified that he could not recall the exact language of the foregoing memorandum nor state that he had read the specific language therein. However, he recalled that he had seen a message within a few days after May 22, 1947, containing the language “Clear all decks for Big Production”. He remembered this statement, because he was familiar with Mr. Kamen’s use of figures of speech and was amused by the expression.
By May 26, 1947, Barberton had received a copy of plaintiff’s bid, because on that date it sent the New York office a teletype quoting certain information from the bid.
As shown in finding 31, the New York office sent the plant manager at Barberton a teletype on May 27,1947, requesting *707 the manager’s suggestions regarding the purchase of six cars of tallow. On the same day the manager replied that the two cars of tallow then on order would meet the plant’s requirements for another month and expressed his belief that the tallow could be purchased at market prices when the plant was ready for it. The contract had not been awarded to the plaintiff at that time, and tallow was freely available. Despite the plant manager’s advice, the plaintiff ordered two cars of tallow on May 27,1947, for delivery in June 1947.
On June 2,1947, Barberton advised New York by teletype that the plant had on May 29,1947, produced an experimental batch of soap conforming to the specifications.
83. The memorandum of June 6, 1947, from New York to Barberton read as follows:
Interoppice Memorandum Kamen Soap Products Co., Ino.
Date: Jime 6,19$.
To: Barberton
From: N. Y. office
Subject: Quartermaster Contract J C Q D 27
Have booked contracts for enough tallow for you to get started. Suggest you use the stock on hand first, before releasing the new tallow. Am negotiating with Swift through their N. Y. broker for 15 to 20 cars additional. Meanwhile have not yet received VSD’s or marking instructions for the bags.
Am thoroughly disgusted with their tactics as they are putting us off from day to day. Meanwhile, we are not taking any new .business as this contract plus what we committed ourselves to the Veterans will keep us going for several months.
Should you hear from the Army inspector, ask him to contact his superiors in the N. Y. office.
Do not start production unless you receive shipping instructions and bill of lading for immediate shipment.
I realize the payrolls have to be continued high until you get into full production.
ALK: bio
In May 1947, plaintiff had ordered four cars of tallow for delivery during the second half of June.
On June 2,1947, a teletype from Barberton requested New York for a copy of the contract in order to enable Barberton *708 to order printed bags. New York replied by teletype on June 5 as follows:
CANT GIV U DEFINITE INFO ON PRINTING FOR BAGS CONTRACT NO. W-3 0-28 O-QM-5 028 01-5847 QUARTERMASTER MR
MCINTOSH NOT IN OFFICE TODAY ADVISED BY SECRETARY THAT THE PRINTED MATTER SHUD BE ACCORDING TO SPEC NO. 9 4A CONTRACT WILL BE READY WITHIN FEW DAYS HAV U THIS SPEC THERE END
Barberton then asked for a copy of Specification 94A and New York replied that it would obtain and mail the specification the next day (June 6,1947).
On June 6, 1947, Barberton sent a teletype message requesting New York to find out whether printed labels could be used in lieu of printed bags. New York replied:
CANNOT GET U DEFINITE INFO RE PRINTING OF BAGS WILL SEE MR MCINTOSH MONDY AND WILL ADV SOON AS ANY INFO RECD
The diary of Mr. Macintosh for June 6,1947, has an entry reading:
KAMEN CALLED REGARDING MARKING OF THE PACKAGES. SENT COPY OF 94-A.
It is suggested in the memorandum that the plant should use the tallow on hand for the production of soap for the Quartermaster before using any new tallow. The tallow on hand consisted of an inventory of 300,400 pounds, which was not intended for use on the contract. On January 10, 1950, plaintiff wrote its attorneys (defendant’s exhibit 101) stating:
* * * the inventory on hand was definitely intended for the Veterans Contract No. 1 to whom we sold the soap at a higher price.
The statement in the memorandum to the effect that plaintiff was being delayed as of June 6, 1947, because of the Government’s failure to furnish marking instructions is contrary to the facts. As stated in finding 32, all the marking instructions needed for ordering printed bags were contained in a standard specification which plaintiff could have obtained on the date the bid was submitted, since it was freely available to any bidder. It was only after the *709 Barberton offiee had made several requests by teletype for this information that Mr. Kamen called on Mr. Macintosh and obtained a copy of the specification (finding 38). Although additional information for marking certain of the bags was needed at the túne of shipment, plaintiff had no tallow on hand to manufacture soap for the Quartermaster Corps on June 6, 1947, and therefore had no need for such instructions.
The statement in the memorandum indicating that plaintiff was being delayed as of June 6,1947, for lack of VSD’s is also contrary to the facts. On that date, plaintiff had outstanding a bid to the Veterans’ Administration covering a quantity of soap, for the manufacture of which 600,000 pounds of tallow would have been required. The 300,400 pounds on hand at that time were all intended for use on that contract. Plaintiff had also made commitments in May to deliver soap, requiring the use of 100,000 pounds of tallow early in June 1947. Plaintiff’s first order for tallow that might have been used on the Quartermaster contract called for the tallow to be delivered during the second half of June 1947, and delivery was not made until in July 1947.
84. The memorandum of June 10, 1947, reads as follows:
INTEROPPICE Memorandum Kamen Soap Products Co., Inc.

Date: June 10, 191fl.

To: New York
From: Barberton
Subject: Ke BS 6976
Indirect labor and overhead is sure mounting. Can we not sell some soap to other trade while waiting for releases from the Quartermaster.
The latter part of April we received notice from NY NH & HRR that shipment of ten drums soap powder to Butler Bros. Co., Springfield, Mass, had been refused due to wrong size drums. On May 27th, we advised that this material should be returned to Barberton.
We are now in receipt of letter dated June 6th from the Railroad Co. advising that these drums were reconsigned to the Paul-Joan Co., Somerville, Mass, as per instructions of Assoc. Brokers of New England. Please handle billing accordingly.
RHS ;bm
*710 The record (finding 37) shows that in the months of June and July 1947 plaintiff had requested but was unable to obtain shipping documents.
Kobert H. Smith was employed as office manager in plaintiff’s Barberton plant from 1943 until about July 1, 1948. He handled most of the interoffice memoranda between the plant and the New York office. He was unable to recall that he had seen any of the questioned memoranda. However, with respect to the memorandum of June 10, 1947, he had a vague recollection of the incident involving the error in the shipment of drums of soap to Butler Bros. It was part of his duties to trace the drums.
In the first paragraph of the above-quoted memorandum, the Barberton office made an inquiry regarding the sale of soap to other customers during the period plaintiff was waiting for releases from the Quartermaster Corps. As heretofore pointed out, plaintiff did not have, as of June 10, 1947, any tallow which was intended for use on the Quartermaster contract and which had been purchased at a price sufficiently low for that contract. Plaintiff had not placed any orders that called for delivery of tallow that might have been used on the contract by June 10,1947.
85. The memorandum of June 12,1947, reads as follows:
INTEROEPICE MEMORANDUM
Kamen Soap Products Co., Inc.
Date: June 1%, 1947.
To: Barberton
From: New York — ALK
Subject: Quartermaster Contract JCQD 27
We have just received our contract from the Quartermaster Purchasing Office, but no shipping instructions. We have started to sell some of the soap intended for this contract to others, but we will keep after them for VSD’s.
Now they blame the delay to the shortage of office help due to vacations in their New York office and Washington. Macintosh promised to do all he can.
We also requested, inspection arrangements and were referred to Mr. Bookman at inspection headquarters, who said they they [sic] cannot assign any inspector to this contract until his department receives *711 request from Macintosh which he does not yet have. He also said we must have VSD, bill of lading and all specifications before starting manufacture. He advised against manufacturing until his survey man gets to our plant. He is short of men now but he will get one out from the midwest within a couple of weeks.
He will require analytical facilities at our plant or a nearby lab before any releases can be made. I told him that we have a good lab and all the inspection and analysis can be done at our own place.
ALK
Plaintiff received the contract on June 12, 1947, and returned an executed copy thereof with a friendly letter of acknowledgment (finding 23), which contained no complaint or protest.
In the first paragraph of the memorandum, it was stated that plaintiff had begun the sale of some of the soap, intended for the contract, to others. Plaintiff did not begin the manufacture of soap for the contract until August 4, 1947. On June 12, 1947, plaintiff did not have any soap made from tallow that was intended for use on the Quartermaster contract, because plaintiff had no tallow on hand at that time that had been acquired for that purpose.
The second paragraph of the memorandum stated, in effect, that Mr. Macintosh had reported that the defendants inability to furnish shipping documents was due to a shortage of office help. This statement is inconsistent with the evidence offered by plaintiff as to the reason for the Government’s delay in supplying shipping documents. Such evidence (findings 37 and 51) shows that Macintosh attributed the lack of shipping instructions to a shortage of storage space rather than insufficient office help.
Mr. Harold Goodman, area supervisor for the Quartermaster Inspection Service, wrote plaintiff’s Barberton office, stating that he planned to visit the plant on July 11,1947, to discuss arrangements for inspecting, packing, marking, and shipping the soap. However, on July 22,1947, when Peter Carr, the inspector who was assigned to the contract, telephoned the plant engineer to inquire when production would begin, he was told that the plant would not be ready to manufacture soap for a few days.
*712 Mr. Carr was busy on other inspection work on August 4, 1947, when plaintiff first started the production of soap for the contract and did not arrive at the plant until August 7, 1947.
86. The memorandum of July 11, 1947, reads as follows:
InteRoppice Memorandum Kamen Soap Products Co., Inc.
Date: July 11, lOJfl.
To: New York
From: Barberton, Ohio Subject: JCQD 27 Contract 5847
Mr. Harold L. Goodman, Supervisor Inspector was here. He looked our plant over and he seemed well impressed with the laboratory and our manufacturing facilities.
He left his mailing address where we can contact him when we are ready to start production. He advised not to start until we are all set with shipping documents so that the Inspector can realease [sic] shipment as tested and approved.
An inspector will be assigned by him to our plant when we have all shipping and marking information.
The evidence does not show exactly when Mr. Goodman visited plaintiff’s plant, but as stated in the preceding finding, his letter of July 8, 1947, to Barberton stated that he planned to visit the plant on July 11, 1947, the date of the above-quoted memorandum. His letter (plaintiff’s exhibit 7) also stated that he desired to survey the analytical facilities in the Barberton plant. Mr. Goodman was not called as a witness in the case.
87. The memorandum of July 16, 1947, read as follows:
Interoppice Memorandum Kamen Soap Products Co., Inc.
Date: July 16,191ft.
To: Barberton, Ohio
From: New York
Subject: JCQD 27 Contract W30-280-QM5028
Saw Macintosh today again and told him that the lot of bags offered to us on our bid was sold and will have to use smaller bags from stock and not purchase.
If we purchased those bags we could have saved over $1,400.00 on the total contract. This lot of bags was *713 good either for export or domestic and could have been stenciled. We pointed out that our stock bags will hold only 35 lbs. as against 125 intended and that we have now ordered 5 ply for export. He agreed and said he will pass the information on to Mr. Bookmane [sic] of Inspection Headquarters.
He still does not have information on V. S. D. He hopes to receive it any day now.
On future Army bids we should add on 25% for such stupid contingencies.
The diary kept by Mr. Macintosh shows that Mr. Kamen called on him regarding the contract on July 16,1947. Thereafter on July 21,1947, plaintiff wrote Mr. Macintosh the following letter, which was signed by Mr. Kamen as president:
I respectfully refer to our conversation at your office on July 16th regarding the above contract where the following was agreed upon:
A. That all domestic packing would be in 4 ply paper-bags in accordance with the Consolidated Freight Classification. The bags to be wired tied and to weigh 35 lbs. net each.
B. Export Bags to be multiple 5 ply and to comply with JNP-118A
We are sending a copy of this letter to Mr. Bookman Inspection Headquarters, and will appreciate it very much if you will kindly arrange that the field inspector is advised of this instruction.
Thanking you very much for your courtesy, we remain
However, plaintiff’s New York office did not inform its Barberton office that the 35-pound bags could be used for the domestic pack until August 6,1947. On that date, Bar-berton sent New York a teletype (plaintiff’s exhibit 38), reading as follows:
RE J CQD DID tr GET OK TO SHIP 35 LB BAGS THE XXXXX EOR DOMESTIC THE SMALL BAGS WE HAV ON HAND WILL HOLD 35 LBS THE BAGS ON ORDER TO HOLD 50 LBS R BEING HELD T3P BY MEGR PENDING CREDIT INVESTIGATION
On the same day, New York replied as follows:
OK TO SHIP IN 35 OR 50 LB BAGS
88. As shown in preceding findings, statements in some of the questioned interoffice memoranda are consistent with the facts. On the other hand, a number of the statements *714 in these documents are inconsistent with and contrary to the facts. The satisfactory and convincing evidence, particularly the unchallenged documentary evidence, establishes that the seven interoffice memoranda were not prepared nor transmitted in 1947 between plaintiff’s New York office and its Barberton plant, but were in fact prepared in 1949 and were presented by Mr. Kamen, through his attorneys, to the General Accounting Office for the purpose of inducing that agency to allow plaintiff’s claim.
89. During the performance of the contract, both teletype messages and interoffice memoranda were used to communicate information between plaintiff’s New York office and the plant in Barberton. The teletypes and memoranda are part of plaintiff’s records and were in its possession until the seven memoranda and other documents were delivered to the FBI agents. Plaintiff has preserved the original teletypes and has offered those of June, July and August 1947 in evidence. Among these are plaintiff’s exhibits 12, 18,14,15,16 and 36, which are the original teletype messages from which the photostatic copies, submitted by plaintiff to the General Accounting Office on September 23, 1949, were made.
After it was established that the seven memoranda given to the FBI agents were prepared in 1949, plaintiff offered no convincing evidence in explanation of its inability to produce the documents, which plaintiff says were prepared in 1947.
90. There is no direct evidence showing who prepared the seven interoffice memoranda in 1949, but the facts and circumstances in evidence lead to the conclusion that these documents were prepared by or at the direction of an officer or employee of plaintiff and that at the time Mr. Kamen submitted the memoranda to the General Accounting Office, he knew that these documents had not been prepared and transmitted in 1947.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that plaintiff corruptly attempted to practice, and did practice, fraud against the United States in the proof or establishment of its claim. *715 Accordingly, the defendant’s special plea in fraud is sustained, plaintiff’s claim is declared forfeited to the United States and the petition is dismissed.

 On October 31, 1947, plaintiff wrote the contracting officer: “It should be noted, however, at this time that your contract made in May stated that delivery was not to start until August, and so we were not able to cover our August requirements for fats and oils until July. When we attempted to buy material in September for October and November, the packing companies would not submit any offers.” See finding 43.

 See quoted statement tn finding 30.

 The reference here and in subsequent findings to “plaintiff’s attorney” or “plaintiff’s attorneys” includes one or more members of the firm which represented plaintiff until October 2, 1952. Present counsel was not employed until November 7, 1952.